**Edwin OWENS, M.D., Appellant,**

v.

**Domingo PEREZ as Next Friend of Maria SAN JUANA MORIN, A Non Compos Mentis, Appellee.**

**No. 13–01–00876–CV.**

Court of Appeals of Texas, Corpus Christi–Edinburg.

Feb. 3, 2005.

Rehearing Overruled April 7, 2005.

---

Linda C. Breck, Thomas F. Nye, Robert W. Clore, Brin & Brin, Corpus Christi, for appellant.

Alex M. Miller, San Antonio, Richard E. Zayas, Brownsville, for appellee.

Before Justices HINOJOSA, YAÑEZ, and GARZA.

## OPINION

Opinion by Justice HINOJOSA.

This is a medical malpractice case. Appellee, Domingo Perez ("Perez"), as next friend of Maria San Juana Morin ("Morin"), a non compos mentis, sued appellant, Edwin Owens, M.D. ("Dr.Owens"), and others [1] after Morin, suffered a third-degree burn to her arm during or after outpatient eyelid surgery. A jury found that Dr. Owens, the anesthesiologist during the surgery, was thirty percent responsible for the negligence that caused the burn and found damages totaling $500,000. In four issues, Dr. Owens contends: (1) the evidence is legally and factually insufficient to show that he caused the burn; (2) the trial court abused its discretion in excluding the testimony of Margie Cornwell, M.D. ("Dr.Cornwell"); (3) the evidence is legally and factually insufficient to support the medical damages awarded by the jury; and (4) the trial court abused its discretion in appointing an ad litem to represent Morin's interests and taxing ad litem fees against him. We reform the trial court's judgment and, as reformed, affirm.

### I. SUFFICIENCY OF THE EVIDENCE

In his first issue, Dr. Owens contends the evidence is legally and factually insufficient to establish that he breached the standard of care or that he proximately caused appellee's burn.

### A. Standard of Review

When we review a "no evidence" or legal sufficiency of the evidence issue, we must view the evidence in a light that tends to support the finding of the disputed fact and disregard all evidence and inferences to the contrary. *Bradford v. Vento*, 48 S.W.3d 749, 754 (Tex.2001). A no evidence issue will be sustained when the record discloses that: (1) there is a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence conclusively establishes the opposite of the vital fact. *Merrell Dow Pharms. v. Havner*, 953 S.W.2d 706, 711 (Tex.1997). If there is more than a scintilla of evidence to support the finding, the no evidence challenge fails. *Stafford v. Stafford*, 726 S.W.2d 14, 16 (Tex.1987). When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is not more than a scintilla and, in legal effect, is no evidence. *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex.1983). More than a scintilla of evidence exists where the evidence supporting the finding, as a whole, rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Havner*, 953 S.W.2d at 711.

When we review an "insufficient evidence" or factual sufficiency of the evidence issue, we consider, weigh and examine all of the evidence which supports or undermines the jury's finding. *Plas–Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex.1989). We review the evidence, keeping in mind that it is the jury's role, not ours, to judge the credibility of the evidence, to assign the weight to be given to testimony, and to resolve inconsistencies within or conflicts among the witnesses'

---

1. At trial, Villa Residential Care Homes, Inc. and Dolly Vinsant Memorial Hospital were also defendants. The jury found that Villa Residential Care Homes, Inc. was not negligent and that Dolly Vinsant Memorial Hospital was seventy-percent responsible for the negligence that caused Morin's burn. Dolly Vinsant Memorial Hospital is not a party to this appeal.

testimony. *Wilhelm v. Flores,* 133 S.W.3d 726, 732 (Tex.App.-Corpus Christi 2003, pet. filed). We set aside the verdict only when we find that the evidence standing alone is too weak to support the finding or that the finding is so against the overwhelming weight of the evidence that it is manifestly unjust and clearly wrong. *Ortiz v. Jones,* 917 S.W.2d 770, 772 (Tex. 1996).

## B. Medical Malpractice

To prevail, a plaintiff in a medical malpractice case must prove the following four elements: (1) a duty by the physician to act according to a certain standard; (2) a breach of the applicable standard of care; (3) injury or harm to the plaintiff; and (4) a causal connection between the breach of the applicable standard of care and the injury or harm. *Krishnan v. Ramirez,* 42 S.W.3d 205, 212 (Tex.App.-Corpus Christi 2001, pet. denied). The jury is usually allowed to decide the issue of causation: (1) when general experience and common sense will enable a layman fairly to determine the causal relationship between the event and the condition; (2) when scientific principles, usually proved by expert testimony, establish a traceable chain of causation from the condition back to the event; and (3) when probable causal relationship is shown by expert testimony. *Duff v. Yelin,* 751 S.W.2d 175, 177 (Tex. 1988). To establish proximate cause, a plaintiff must prove foreseeability and cause in fact. *Id.* at 176. Regarding cause in fact, the plaintiff must establish a causal connection based upon "reasonable medical probability," not mere conjecture, speculation, or possibility. *Id.*

The rule of "reasonable medical probability" relates to the showing that must be made to support an ultimate finding of fact and not to the standard by which the medical expert must testify.

*Lenger v. Physican's Gen. Hosp.,* 455 S.W.2d 703, 707 (Tex.1970). Expert testimony concerning the possible causes of the condition in question will often assist the jury in evaluating other evidence in the case. *Id.* However, a plaintiff is not required to establish causation in terms of medical certainty, nor is he required to exclude every other reasonable hypothesis. *Krishnan,* 42 S.W.3d at 212.

## C. Analysis

Maria Morin, eighty-six years of age, was a resident of Villa Residential Care Homes, Inc, an assisted living center. On February 26, 1998, Morin was taken to Dolly Vinsant Hospital for an out-patient surgical procedure on her eyelid. Dr. Owens served as the anesthesiologist for Morin's procedure, during which an IV was run into Morin's right hand. Following surgery, Morin's right hand showed signs of injury, which were ultimately determined to be third degree burns. Morin required two surgical debridements and three skin grafts. Morin's suit against Dr. Owens was based on the theory that Morin's IV fluid had been excessively heated.

Yolanda Rodriguez, a Villa Residential employee, testified that Morin had no injuries to her arm when Rodriguez accompanied Morin to the hospital two days prior to surgery. At this time, Morin's hospital's medical records show that Morin was oriented, alert, and demonstrated her understanding of her surgical orders.

Consuelo Gonzales, the licensed vocational nurse at Valley Baptist Medical Center who treated Morin during pre-operative procedures before Morin was taken in to surgery, had no independent recollection of Morin but testified after reviewing Morin's medical records. Gonzales's testimony illustrates several inconsistencies in Morin's chart. Gonzales testified that Dr. Owens' orders for the surgery specified

that Morin was to receive lactated ringers solution (a salt-based solution) in her IV. Nevertheless, Morin's pre-operation report showed that Morin received an IV of D5W dextrose solution (a sugar-based solution). In contrast, the post-operative report and the billing report state that Morin received lactated ringers solution. The billing report indicates only one bag of fluid was administered.

Dr. Owens's surgical orders called for nurses to utilize a .20 jelco needle to insert the catheter for the IV. Nevertheless, Morin's pre-operation report showed that nurses instead utilized a .22 jelco needle, attempting the insertion of the catheter in three separate locations. In contrast, the anaesthesia records showed that a .20 jelco needle was used.

Gonzales testified that she has never used heated fluids in an IV, although she was aware that Dolly Vinsant sometimes used heated fluids. She admitted IVs are sometimes changed in the operating room, and if an IV is changed, then the needles used are also changed. After Gonzales assisted Morin, Morin was taken to surgery.

Gonzales testified that Nurse Richardson was in charge of the notations on the pre-operation and post-operation reports. She said that Richardson was a competent nurse. At the time of trial, Richardson was no longer employed by Valley Baptist, as were any of the other four employees that had actually been involved in Morin's surgery.

Dr. Owens testified that he had no independent recollection of Morin's surgery. Dr. Owens testified: (1) that he sometimes uses heated IV fluids at the hospital; (2) when he uses heated IV fluids, he does not note it in the patient's chart; and (3) he often changes IV fluids in the operating room. According to Dr. Owens, the only way to warm IV fluids was to use the warmer in the surgical suite, and then transfer it to the ambulatory care unit, where Morin's surgery took place. Dr. Owens also testified that the first bag of IV fluids is usually not heated, and that he has never used heated IV fluids in an eyelid surgery. Dr. Owens testified that heated IV fluids are only used in surgery when there is a great blood loss to keep the patient warm, and Morin's eyelid surgery did not require heated IV fluids. Dr. Owens said it was not his "habit" to give warm fluids to a "case like this." Similarly, Dr. Richard B. Hecker, chief of anesthesia at Christian Santa Rosa Children's Hospital, testified he would never use heated IV fluids in an eyelid surgery, and that most anesthesiologists would not use heated IV fluids in an eyelid surgery.

Dr. Owens said that Morin went into surgery with an IV solution bag containing 500 cc of fluid. He testified that Morin's records show that only 300 cc of fluid were used during surgery and 200 cc of fluid were left in the bag after the surgery, therefore, Dr. Owens concluded that only one bag of fluid was administered to Morin. In connection with this testimony, the anesthesia record indicates that the total amount of fluid administered to Morin was 300 cc. However, according to other evidence adduced at trial, the post operative report shows that 300 cc remained in the bag, and further indicates that Morin received an additional 100 cc of fluid during her stay in recovery.

Dr. Owens acknowledged that Morin's hospital chart showed at least two different types of IV solution. He further acknowledged that there were several instances in Morin's records indicating that Morin said the pain, redness, and swelling began after the IV, and she never indicated that it was an external burn.

Dr. Owens testified that it was not possible, under any circumstances, that Morin's injuries were caused by the IV. Dr. Owens stated that there was "no way" an IV could cause an injury like Morin's. Dr. Owens did acknowledge, however, that certain IVs could cause a progressive injury, as did defense expert Dr. Luis Rios, a hand surgeon.

Dr. Owens admitted that he was ultimately responsible for Morin and the condition of her IV; however, he was not responsible if a scalding IV burned her if he was not told about it and he did not order it. Upon cross examination, Dr. Owens conceded that his sworn requests for admissions, in which he denied ordering the IV, were incorrect. Dr. Owens testified that he has never witnessed medical negligence.

According to the medical records, following the surgery, Morin was "assisted" into a recliner "without difficulty." Morin's records stated that Morin was awake and alert when discharged from the hospital following surgery, and no redness, swelling or edema was noted at the IV site.

Following the surgery, Morin returned to Villa Residential at approximately 5:00 or 6:00 p.m. Rodriguez and another employee assisted Morin in alighting from the van and into her bed. According to Rodriguez, Morin appeared very weak and the employees had to carry a great deal of Morin's weight while walking her to her room. In contrast to the hospital's medical records, Rodriguez testified that Morin was drowsy and appeared to still be sedated. Rodriguez testified that Morin told Rodriguez that her arm hurt. The employees put Morin straight to bed. That evening, Morin was atypically incontinent. The incident report for the 26th showed that Morin was weak and required assistance, and was observed "frequently" by employees.

Juanita Villarreal, the assistant executive director and licensed vocational nurse at Villa Residential, testified that no one at Villa Residential applied any heat to Morin, whether in the form of a heating pad or bag or other heat source, nor would staff have applied any type of compress to Morin's arm. Morin could not have burned herself with hot water at Villa Residential because the water is regulated at 122 degrees. Rodriguez also testified that there were no heating devices in Morin's room or elsewhere at Villa Residential that could possibly have caused the burn. Villarreal reviewed Morin's belongings when she was discharged from Villa Residential and she saw nothing that could cause a burn.

According to Rodriguez, it was impossible for Morin to have burned herself after the surgery because Morin was asleep from her return from the hospital until the following morning. On February 27th, at approximately 6:00 or 6:30 a.m., attendant Gloria Hernandez noticed that Morin, who usually came to breakfast, had not appeared for breakfast. Hernandez went to get Morin and found her sitting up in bed. Morin again complained of pain in her hand and arm, and Hernandez saw that Morin's hand was red, warm, and swollen. Hernandez administered Tylenol. Rodriguez did not complete an incident report on the 27th regarding Morin's complaints of pain in her arm "because everybody hurts when they pull the IV." That day, a nurse from Valley Baptist Medical Center telephoned and inquired about Morin's status. When Rodriguez told the nurse that Morin's arm was hurting, the nurse said, "Well I hope it wasn't the arm where she had the IV."

The following day, February 28, Morin's hand was worse. It was swollen, red, and purplish with a "bruised" appearance. The employees at Villa Residential took

her to Dr. Sunil John, whose records indicated that Morin was alert and oriented, and that Morin related that she had experienced pain and swelling in her hand since the IV. John referred Morin to an orthopedic surgeon, Dr. Herman Keillor. Dr. Keillor's initial notes from examining Morin show:

> She allegedly had some type of eye surgery on Tuesday this past week and said there was an IV line in her right wrist. She has had pain and swelling since that time. Now more dramatically the hand has become severely swollen with fluid in the dorsum of the wrist. The skin is dark. It looks much like a burn. On the radial aspect of the wrist there is a white area that looks deep second degree. It is almost as if this had been burned and yet no heat had been applied . . . she is very poor historian.

Dr. Keillor testified that he attempted to get Morin to acknowledge that external heat had been applied to her hand in some form, but Morin denied this. Dr. Keillor concluded that Morin's testimony was "not valid upon examining her the first day[.]"

Dr. Keillor hospitalized Morin and performed two surgical debridements, including the removal of some of the veins in Morin's arm, and three separate skin grafts to her hand, wrist, and forearm. Morin was hospitalized from February 28, 1998 to March 23, 1998, when she was discharged to a nursing home.

Dr. Keillor, who served on Dolly Vinsant's board for quality care, acknowledged that Dolly Vinsant sometimes utilized heated IV fluids. Dr. Keillor stated that fluids could be heated in a microwave. He testified that an internal burn would require the administration of IV fluids heated to approximately 160 to 180 degrees. He said a person would not be able to hold an IV bag heated to those temperatures. He further testified that a burn caused by the administration of heated IV fluids would cause redness, swelling, and blistering at the IV site within twenty to thirty minutes, and this did not occur in Morin's case. In Dr. Keillor's opinion, Morin's burn was caused by an external heat source, specifically, low heat applied one to three days after her surgery, for a duration of six to eight hours. Although Dr. Owens denied any relationship with Dr. Keillor, Dr. Keillor spoke with Dr. Owens, whom he referred to as "a good friend," about the case on two occasions, and recounted socializing with Dr. Owens at his home.

Villarreal testified that before the surgery Morin enjoyed dancing and singing and was very happy at Villa Residential. Domingo Perez testified that before this incident Morin spoke, walked, and fed and groomed herself. After the burn, Perez couldn't talk to her. "She complained a lot. She couldn't—[.]" He said that after the hospitalization, Morin started to speak a "little" better, but then was no longer able to communicate verbally.

At trial, appellee presented the expert testimony of anesthesiologist, Dr. Richard F. Toussiant, Jr. Dr. Toussiant testified that medical personnel use heated IV fluids when administering large quantities of fluids and to keep certain patients, such as elderly or pediatric patients, from becoming hypothermic. He said that medical personnel do not always note in the hospital records when they use heated fluids. Dr. Toussiant testified:

> the only way this [burn] could have happened was with the administration of something hot. And given the distribution of the injury in the area of the IV site, I've concluded that high temperature fluids were administered through the IV[and] that the administration of excessively heated fluid through an IV

causing an injury is below the standard of care.

Dr. Toussiant also testified that the type of injury and progressive nature of the injury indicated the use of heated IV fluids. He opined that a heating pad did not cause the burn because: (1) the injury appeared the morning after the surgery and worsened over time, which was consistent with an internal burn rather than a burn caused by external heat; (2) the pattern of the injury was inconsistent with the type of burn a heating pad would have produced; and (3) a heating pad would not be appropriate treatment for phlebitis. Toussiant said that within reasonable medical probability, the "only" mechanism for the injury was the administration of heated IV fluids. Upon cross-examination, Dr. Toussiant acknowledged that "most" people would show signs and symptoms of such a burn within twenty to thirty minutes.

After reviewing the evidence in a light that tends to support the jury's finding and disregarding all evidence and inferences to the contrary, we conclude there is more than a scintilla of evidence to support the verdict. *Stafford*, 726 S.W.2d at 16. Accordingly, we hold the evidence is legally sufficient to support the jury's finding that Dr. Owens breached the standard of care and that he proximately caused Morin's burn.

After reviewing the entire record, we also conclude that the jury's finding is not so contrary to the overwhelming weight and preponderance of the evidence as to be clearly wrong and manifestly unjust. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex.2001). Morin showed no sign of injury prior to surgery. Neither Dr. Owens nor any other medical personnel recalled Morin's surgery. Doctors and nurses acknowledged using high-temperature IVs on occasion and such use would not be noted in a patient's medical records. Mo-

rin's burns occurred on the arm with the IV in the specific area where the IV was placed. Morin complained to Villa Residential employees that her arm hurt immediately upon her return from surgery. The burns were first seen by the staff at Morin's nursing home when Morin arose from bed the morning following the surgery. The burns appeared progressively worse over time, which is consistent with an internal burn rather than a burn from an external heat source. The staff at the nursing home said the burn did not and could not have occurred at the nursing home. Expert witness Dr. Toussiant testified that, within reasonable medical probability a heated IV was the "only" way Morin's burns could have happened.

Dr. Owens contends there is no direct evidence that heated IV fluids were administered to Morin, and the circumstantial evidence presented does not establish that he administered any heated IV fluids to Morin. However, the jury is allowed to consider circumstantial evidence, weigh the credibility of the witnesses, and make reasonable inferences from the evidence it chooses to believe. *See Benoit v. Wilson*, 150 Tex. 273, 239 S.W.2d 792, 797 (1951). Given the numerous conflicts in Morin's medical records and the conflicting testimony from Dr. Owens and other witnesses, we defer to the jury's determination.

Accordingly, we hold the evidence is factually sufficient to support the jury's finding that Dr. Owens breached the standard of care and that he proximately caused Morin's burn. We overrule Dr. Owens' first issue.

## II. Expert Testimony

In his second issue, Dr. Owens complains the trial court abused its discretion by excluding Dr. Cornwell's testimony that the source of Morin's burn was exter-

nal. Dr. Owens contends Dr. Cornwell's testimony was critical and necessary for his defense. We review a trial court's decision to strike an expert's testimony under an abuse-of-discretion standard. *Gammill v. Jack Williams Chevrolet, Inc.,* 972 S.W.2d 713, 718 (Tex.1998).

After performing skin-graft surgery on Morin, Dr. Keillor sent a tissue sample to Dr. Cornwell for pathological analysis. In a March 9, 1998, report, Dr. Cornwell made the following diagnosis: "debridement: necrosis with acute inflammation consistent with clinical history of third-degree burn."

On May 22, 2001, Dr. Owens filed his designation of expert witnesses and included Dr. Cornwell as a treating pathologist. On June 18, 2001, Dr. Cornwell's deposition was taken.

On June 25, 2001, immediately before jury selection, the trial court considered the parties' motions in limine. During the pre-trial hearing, the court asked whether anyone wanted to strike any witnesses. Appellee's attorney stated:

> There ... is a Doctor Margie Cornwell who is a pathologist with Valley Baptist Medical Center. She issued a report back at the time of the incident, and the report basically says: Third degree burns. That is an undisputed claim in this case.... Since that time, in the last few months she had come up with additional opinions of source and causation of burn, and she has testified under oath to that.

A colloquy subsequently occurred regarding whether Dr. Cornwell had been designated as an expert witness and whether she was an expert on burns and causation. Dr. Owens' counsel informed the court that

a *Daubert/Robinson*[2] motion had not been filed and that such a motion was the proper vehicle to object, instead of a motion in limine. The trial court then stated:

> [t]he pathologist, if she made the findings two years ago ... and she recalls some things about it.... She is not going to be allowed to change ... her opinion about, or make any different finding[s] about it. If she thought it was all right at that point in time, she should have done it ... instead of waiting two or three years down the road when you're suing the doctors and the hospital and saying, well, it is different now.

The court subsequently stated:

> I don't think that for purposes of voir dire, it is necessary to get into that with the jury.... I will take care of it at the time of the trial itself, and I will hear that motion outside the presence of the jury again.

A jury was selected and impaneled on June 25, 2001. The next morning, appellee filed a motion to exclude Dr. Cornwell, asserting a *Daubert/Robinson* challenge. In the motion, appellee claimed that Dr. Cornwell did not meet the six *Daubert/Robinson* factors. On June 27, 2001, the trial court signed an order granting appellee's motion to exclude Dr. Cornwell's testimony. In the order, the court stated it had determined Dr. Cornwell did not meet the six *Daubert/Robinson* factors.

On June 28, 2001, counsel for Dolly Vinsant Memorial Hospital ("the Hospital") called Dr. Cornwell as a witness. Because of the prior exclusion order, the trial court was asked whether it wanted to hear Dr. Cornwell's testimony outside the presence of the jury. The court replied:

**2.** *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 589–90, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *E.I. du Pont de Nem-* ours & Co. v. Robinson, 923 S.W.2d 549, 556 (Tex.1995).

I guess. I don't have any problem hearing it. I think you are only going through qualifications.... I think everybody will stipulate that she is a very good pathologist. I have no problem with her pathology expertise. She has testified in many murder cases, in my court.

The Hospital's attorney then examined Dr. Cornwell outside the presence of the jury regarding her qualifications as an expert witness. After the jury returned to the courtroom, the Hospital's attorney asked Dr. Cornwell about her qualifications and the diagnosis she had made in her pathology report. At a bench conference, the Hospital's attorney asked the court for permission to question Dr. Cornwell regarding the cause of Morin's burn. The trial court denied the Hospital's request, and Dr. Cornwell was excused.

Later, the Hospital's attorney made a formal bill of exception outside the presence of the jury. *See* Tex.R.App. P. 33.2. Dr. Cornwell opined that the burn was caused by an external heat source, and also testified regarding her qualifications and opinions as an expert.

■ A ruling on a motion in limine is a tentative ruling and preserves nothing for appeal. *See Southwest Country Enters., Inc. v. Lucky Lady Oil Co.*, 991 S.W.2d 490, 493 (Tex.App.-Fort Worth 1999, pet. denied). To preserve a complaint regarding the exclusion of evidence, the complaining party must actually offer the evidence during the trial and secure an adverse ruling from the court. *Wyler Indus. Works, Inc. v. Garcia*, 999 S.W.2d 494, 511 (Tex.App.-El Paso 1999, no pet.); *see also* Tex.R.App. P. 33.1(a).

The record shows that Dr. Owens obtained a ruling on appellee's motion in limine prohibiting Dr. Cornwell from testifying regarding the cause of Morin's burn. However, Dr. Owens did not actually offer the evidence during the trial and secure an adverse ruling from the court. Dr. Owens neither asked the trial court for permission to examine Dr. Cornwell regarding the cause of Morin's burn, nor did he join in the Hospital's request to examine Dr. Cornwell regarding the cause of Morin's burn.

Accordingly, we hold that Dr. Owens did not preserve this issue for our review. *See* Tex.R.App. P. 33.1. Appellant's second issue is overruled.

### III. PAST MEDICAL EXPENSES

■ In his third issue, Dr. Owens contends: (1) the evidence is legally and factually insufficient to support the jury's finding of past medical expenses of $141,000; (2) alternatively, the evidence is legally and factually insufficient to support the jury's finding of past medical expenses in excess of $60,561.74; and (3) alternatively, the jury's finding of $141,000 is contrary to the stipulations of the parties.

The jury heard the following evidence regarding Morin's past medical expenses: (1) testimony from Dr. Keillor; (2) billing records from Harlingen Bone & Joint Clinic totaling $7,719.69; (3) billing records from San Juan Nursing Home totaling $91,291.31; and (4) billing records from Valley Baptist Medical Center totaling $42,821.43.

Dr. Owens argues that only the first three months of Morin's stay at the San Juan Nursing Home, totaling $10,020.63, is attributable to the treatment of her injury. Dr. Owens' argument is based on the following testimony from Dr. Keillor:

Q: In your chart I noticed that you wanted her having skilled nursing care after her discharge from Valley Baptist, correct?

A: Yes.

Q: And in your chart, you say she needs two more weeks of skilled nursing care, and this was ten weeks after the jury-I mean, this was ten weeks post injury[,] ten weeks post discharge from Valley Baptist. So she had been at the San Juan Nursing Home for ten weeks and you said she needed ten weeks and you said she needed two more weeks of skilled nursing home. Does that make sense to you?

A: If I said that it was because we were having trouble with the donor site and I didn't want that to get infected again.

\* \* \* \* \* \* \*

Q: And for that three month period after your treatment, after she was discharged from Valley Baptist that three month period of nursing home care was ... to treat her burn; correct?

A: Yes.

Q: ... Can you tell me what the bill was, for the first three months of nursing home care for Mrs. Morin?

A: $10,020.63.

Q: Was that reasonable and necessary for her care?

A: Again, I don't know the nursing home standards. But I do know a lot of—there is dressing changes, so, over and above the standard nursing home care she had skilled care. And the skilled care was to work on these wounds.

Q: So the degree of necessary ... care was higher in this place than an ordinary custodial care?

A: Right.

We initially note that the record does not contain a stipulation that would affect the amount of damages. As evidence of a stipulation, Dr. Owens refers us to a colloquy between counsel at the bench during closing argument. However, the exchange between counsel does not show the existence of such an agreement.[3] Moreover, there is no written documentation in the

**3.** At closing argument, Appellee's counsel asked the jury for $141,000 for past medical expenses and said he left the remaining damages to the jury's discretion. Counsel then reserved the remainder of his time for rebuttal. The following exchange then occurred:

Defense Counsel: Your Honor, excuse me. The interruption, the rules require [appellee's counsel] to answer fully with damages, unless he is not going to talk to the jury about actual.

The Court: Do you just want to—I thought you were going to tell the jury a figure, an idea.... I thought you were going to tell the jury an idea of damages that you were going to consider....

Defense Counsel: Additionally, [y]our Honor—

Appellee's Counsel: I am asking them to pay the full $100,000—

The Court: Tell the jury that, please.

Defense Counsel: Can we approach on one other matter?

(At the bench, on the record)

Defense Counsel: We had stipulated to $60,000, and not 140. There is no evidence for them.

Appellee's Counsel: All right. I will bring it up.

Defense Counsel: You had an agreement with me, if you bring it up—

(End of bench conference)

Appellee's counsel then asked the jury to find "the full amount of the medical bills that were introduced into evidence that were proved up through Doctor Keillor and the other doctors." Defense counsel objected that appellee's counsel had "gone over the maximum amount" of damages. Defense counsel stated: "He has also violated our agreement on what the actual medical expenses are." Argument continued, and appellee's counsel again asked for medical expenses in the amount of $141,000, without objection.

record evidencing a stipulation. *See* TEX.R. CIV. P. 11 ("no agreement between attorneys or parties ... will be enforced unless it be in writing, signed and filed with the papers as part of the record, or unless it be made in open court and entered of record.").

■■■■ The billing records from San Juan Nursing Home were submitted pursuant to Texas Civil Practice and Remedies Code section 18.001. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 18.001 (Vernon 1997). Section 18.001(b) touches upon three elements of proving damages for past medical expenses: (1) the amount of the charges for medical services; (2) the reasonableness of the charges; and (3) the necessity of the charges. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 18.001(b) (Vernon 1997); *Walker v. Ricks,* 101 S.W.3d 740, 747–48 (Tex.App.-Corpus Christi 2003, no pet.); *Barrajas v. VIA Metro. Transit Auth.,* 945 S.W.2d 207, 209 (Tex.App.-San Antonio 1997, no writ). However, evidence presented in accordance with the statute does not conclusively establish the amount of damages nor does it establish a causal nexus between the accident and the medical expenses. *Walker,* 101 S.W.3d at 748; *Sloan v. Molandes,* 32 S.W.3d 745, 752 (Tex.App.-Beaumont 2000, no pet.); *Beauchamp v. Hambrick,* 901 S.W.2d 747, 749 (Tex.App.-Eastland 1995, no writ); *see also Barrajas,* 945 S.W.2d at 208 n. 1. A plaintiff may recover only for reasonable and necessary medical expenses specifically shown to result from treatment made necessary by the negligent acts or omissions of the defendant, where such a differentiation is possible. *See Texarkana Memorial Hosp., Inc. v. Murdock,* 946 S.W.2d 836, 840 (Tex.1997).

We conclude the evidence is legally and factually sufficient to support the jury's finding of past medical expenses. *See Maritime Overseas Corp. v. Ellis,* 971 S.W.2d 402, 406 (Tex.1998). The business records affidavit for San Juan Nursing Home states that "the service provided was necessary" and the amount charged for the service, "$91,291.31," was "reasonable at the time and place that the service was provided."

We note that Dr. Owen did not file counter-affidavits disputing the reasonableness or necessity of the expenses. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 18.001(e) (Vernon 1997) ("A party intending to controvert a claim reflected by the affidavit must file a counteraffidavit...."). In the absence of a counteraffidavit, we conclude that the business records suffice to support a fact finding regarding the reasonableness and necessity of Morin's medical expenses. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 18.001(a) (Vernon 1997) ("Unless a controverting affidavit is filed ... an affidavit is sufficient evidence to support a finding of fact....").

■■■■ Rather than filing a counter-affidavit, Dr. Owen relied on evidence developed through the cross-examination of Dr. Keillor. Dr. Keillor's testimony indicates that Morin's injuries required three months of skilled nursing care; however, it does not affirmatively establish that the remainder of Morin's period of skilled nursing care was unnecessary. To the extent that Dr. Keillor's testimony could be construed to limit Morin's past medical expenses, we note that it is the jury's role to judge the credibility of the evidence, to assign the weight to be given to testimony, and to resolve inconsistencies within or conflicts among the witnesses' testimony. *Wilhelm,* 133 S.W.3d at 732. In determining the sufficiency of the evidence, appellate courts must accept the jury's resolution of any conflicts or inconsistencies in the evidence. *Barrajas,* 945 S.W.2d at 209.

In this regard, we note that Morin was eighty-six years old at the time of her injury. It is well settled that a tortfeasor takes a plaintiff as he finds her. *Coates v. Whittington*, 758 S.W.2d 749, 752 (Tex. 1988). From testimony presented at trial, Morin was happy, mobile, and talkative prior to her injury. After her injury, Morin was hospitalized for a period in excess of three weeks, during which she underwent two surgical debridements and a surgical graft. The testimony regarding Morin's physical state following the injury, although scant, indicates a significant decline in Morin's capacity. The jury may have inferred that Morin required additional skilled nursing care based on her declining state.

Further, the jury was instructed to determine the damages that would "fairly and reasonably compensate Maria San Juana Morin, for her injuries, if any, that resulted from the occurrence in question." Unless the record demonstrates otherwise, we presume that the jury followed this instruction in answering the damages question. *See, e.g., Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 771 (Tex. 2003). In our evaluation of the evidence, we note that the jury did not uniformly find all items of expenses requested by Morin. Accordingly, Dr. Owens' third issue is overruled.

### IV. APPOINTMENT OF AD LITEM

In his fourth issue, Dr. Owens contends the trial court abused its discretion in appointing an ad litem to represent Morin's interests because no conflict of interest existed between Morin and Perez, her next friend.[4]

On May 2, 2001, after finding that an ad litem needed to be appointed to represent Morin's interests, the trial court signed an order appointing Ernesto Gamez, Jr. as Morin's ad litem. We review the appointment of an ad litem under an abuse of discretion standard. *McAllen Med. Ctr. v. Rivera*, 89 S.W.3d 90, 94 (Tex.App.-Corpus Christi 2002, no pet.). In reviewing a trial court's decision under an abuse of discretion standard, we must determine whether the trial court acted without reference to any guiding rules or principles. *Id.* An abuse of discretion occurs only when the trial court reaches a decision that is so arbitrary and unreasonable as to amount to a clear and prejudicial error of law. *Id.*

When reviewing an appointment of an ad litem, the court should look to whether the next friend bringing suit on behalf of the plaintiff has interests that may run adverse to the plaintiff. *Brownsville-Valley Reg'l Med. Ctr. v. Gamez*, 894 S.W.2d 753, 755 (Tex.1995); *McGough v. First Court of Appeals*, 842 S.W.2d 637, 640 (Tex.1992); *Id.* at 95. A trial court may not appoint a guardian ad litem absent a conflict of interest between the [non-compos mentis] and his next friend. *Rivera*, 89 S.W.3d at 94. Rule 173 of the Texas Rules of Civil Procedure provides, in relevant part:

> When a minor ... or a non compos mentis ... is a party to a suit ... and is represented by a next of friend or a guardian who appears to the court to have an adverse interest to such [person] ... the court shall appoint a guardian ad litem for such a person and shall allow him a reasonable fee for his services.

TEX.R. CIV. P. 173. The conflict need not be actual; potential for conflict during trial or settlement negotiations also authorizes the appointment of a guardian ad litem. *Rivera*, 89 S.W.3d at 95.

---

4. The ad litem, Ernesto Gamez, Jr., did not file a brief in this case.

On June 5, 2001, Dr. Owens filed a written objection to the appointment of a guardian ad litem to represent Morin's interests. Dr. Owens asked the trial court to set a hearing and to withdraw the appointment of a guardian ad litem. In support, Dr. Owens attached a portion of Perez's deposition. At the hearing, Morin's counsel argued that a conflict of interest existed because: (1) Perez may have a stake in any settlement because he might be the only heir to Morin's estate; and (2) Perez may have caused Morin's injuries. Dr. Owens pointed out that Morin did not have a will, Perez was not Morin's heir, and that Morin never alleged that Perez caused her injuries.

Perez's deposition testimony showed that he is not related to Morin. Perez testified that his parents died when he was young, and Morin raised him. Perez said he refers to Morin as his aunt, although he is not biologically related to her. Because Perez is not biologically related to Morin, he is not Morin's heir.

Perez also testified that he filed suit only because he is interested in finding out what happened to Morin. He is not making any claims in the lawsuit on his own behalf.

Because appellee failed to prove a conflict of interest between Perez and Morin, we hold the trial court abused its discretion in appointing an ad litem to represent Morin's interests. Accordingly, we hold the trial court erred in taxing ad litem fees against Dr. Owens. Dr. Owens' fourth issue is sustained.

We reform the trial court's judgment by deleting the award of ad litem fees. As reformed, the trial court's judgment is affirmed.