Brynn RODGERS, Appellant,

v.

CITY OF NORTH KANSAS CITY, et al., Respondents.

No. WD 72328.

Missouri Court of Appeals, Western District.

March 8, 2011.

Motion for Rehearing and/or Transfer to Supreme Court Denied May 3, 2011.

Application for Transfer Denied June 28, 2011.

Thomas W. Koelling, Kansas City, MO, for Appellant.

Timothy S. Frets, Kansas City, MO, for Respondents City of North Kansas City, Donna Cash, Catherine Menninga, Beverly Johnston.

Before Division Two: KAREN KING MITCHELL, Presiding Judge, JOSEPH M. ELLIS, Judge and VICTOR C. HOWARD, Judge.

VICTOR C. HOWARD, Judge.

Brynn Rodgers appeals the trial court's grant of summary judgment in favor of North Kansas City ("the City") and three employees of North Kansas City Hospital ("NKC Hospital") on Rodgers's petition alleging a dangerous condition of the City's property and Rodgers's claims of negligence and medical malpractice against the three employees. On appeal, Rodgers contends that the trial court erred in granting summary judgment because genuine issues of material fact existed as to whether the City waived its sovereign immunity and as to whether the three NKC Hospital employees are entitled to immunity as public officials or under the public

duty doctrine. The judgment of the trial court is affirmed.

### Factual and Procedural Background

We present the facts in the light most favorable to Rodgers. On January 18, 2006, Rodgers went to the emergency room ("the ER") at NKC Hospital at 7:20 p.m. with complaints of a headache, stiff neck, nausea, vomiting, blurred vision, and dizziness. Rodgers's husband accompanied her to NKC Hospital. Rodgers was categorized as a non-urgent patient, and she and her husband were taken to examination room fifteen. The room had four walls and a wooden door. The door had a lock on the inside, which would prevent people outside the room from entering.

William Price, a registered nurse, gave an initial assessment of Rodgers's condition. The ER physician then ordered and performed a spinal tap. In preparation for the spinal tap, Rodgers was given several medications, which have sedative and amnesiac effects. Following the procedure, Rodgers was told to lie still and flat on her back. The ER physician ordered a urinalysis, and Price was to perform a catheterization. At that point, the ER physician and Rodgers's husband had both left the examination room. Price closed and locked the door and was alone in the room with Rodgers. Price then attempted to catheterize Rodgers, but the catheter he was using was too large.

Price left Rodgers in the examination room and soon returned with a smaller catheter. Although Price closed the door, Rodgers did not know if he locked it. Rodgers alleges that at this time, Price penetrated her vagina with his fingers multiple times. After this, Price successfully catheterized her and obtained a urine specimen. Rodgers claims that after Price obtained the specimen, he began brushing his body up and down her body while his penis was erect. Rodgers alleges that Price then administered more medication to her and that she told him that her heart was racing. Price pulled down the top of her gown, and Rodgers claims that he fondled her breasts while he was listening to her heartbeat with a stethoscope. Rodgers was later discharged from the ER at approximately 10:05 p.m.

On January 27, 2006, Rodgers contacted NKC Hospital to file a complaint against Price. On February 1, Rodgers met with several NKC Hospital employees, including Donna Cash, Beverly Johnston, and Cathy Menninga. At the time, Cash was the director of critical care and cardiovascular services, Johnston was the vice president of human resources, and Menninga was the nurse manager of the ER. The hospital investigated Rodgers's claim but was unable to substantiate her allegations. In September 2004, NKC Hospital had investigated a similar claim against Price when a female patient had alleged that Price sexually assaulted her while she was a patient in the ER. The hospital was similarly unable to substantiate that patient's claim. Price continued his employment with NKC Hospital until his voluntary resignation on February 26, 2006.

On July 28, 2008, Rodgers filed her second amended petition for damages against the City and against Cash, Johnston, and Menninga, individually. In her count against the City, Rodgers alleged that the City had prior knowledge of Price's proclivity for inappropriately touching female patients. Despite this knowledge, the City and/or its employees allowed Price to have access to sedative medications and allowed him to be alone with a female patient in an exam room that had a lock on its door. Rodgers alleges that these circumstances constituted a dangerous condition of the City's property and that the City therefore waived its sovereign immunity pursuant to

section 537.600.1(2), RSMo Cum.Supp. 2010.

In her second count, Rodgers alleges that defendants Cash, Johnston, and Menninga knew or should have known of Price's dangerous proclivities and negligently hired, retained, and supervised him. Rodgers claims that the defendants negligently supervised Price in that they failed to monitor his activities and contact with female patients despite their knowledge of previous allegations of inappropriate behavior. Finally, in her third count, Rodgers claims that the individual defendants committed medical malpractice in that they failed to properly supervise and monitor Price and allowed him to be alone with a female patient without the presence of a female health care provider.

The City filed a motion for summary judgment asserting the defense of sovereign immunity. The trial court granted the City's motion, finding that, even if the events occurred as Rodgers described them, the circumstances did not constitute a "dangerous condition" based on the manner in which Missouri courts had previously defined that phrase. The court stated that although the locked door may have given Price a more secure location for his conduct, the locked door itself was not dangerous, and Price's proclivity to commit criminal acts did not relate to the property. Cash, Johnston, and Menninga filed a joint motion for summary judgment in which they asserted, among other defenses, that they could not be held liable because they were protected by official immunity and/or by the public duty doctrine. The trial court granted the motion without stating the grounds upon which it was granting the motion. This appeal by Rodgers followed.

### Standard of Review

An appellate court's review of an appeal from summary judgment "is essentially *de novo.*" *ITT Commercial Fin. Corp. v. Mid–Am. Marine Supply Corp.,* 854 S.W.2d 371, 376 (Mo. banc 1993). Whether or not summary judgment should be granted is an issue of law, and "an appellate court need not defer to the trial court's order granting summary judgment." *Id.* We review the record in the light most favorable to the party against whom summary judgment was entered. *Id.* "Facts set forth by affidavit or otherwise in support of a party's motion are taken as true unless contradicted by the non-moving party's response to the summary judgment motion. We accord the non-movant the benefit of all reasonable inferences from the record." *Id.* (citations omitted).

"Summary judgment is appropriate where the moving party establishes a right to judgment as a matter of law and that no genuine issue of material fact exists." *United Mo. Bank, N.A. v. City of Grandview,* 105 S.W.3d 890, 895 (Mo.App. W.D. 2003). The defending party in the lawsuit may establish a right to judgment as a matter of law by showing facts that negate any one of the elements of the claimant's cause of action. *Id.*

### Discussion

■ In her first point on appeal, Rodgers contends that the trial court erred in granting summary judgment in favor of the City because genuine issues of material fact existed as to whether the City waived its sovereign immunity. Rodgers claims that the City waived its sovereign immunity because Rodgers's injury resulted from a dangerous condition of the City's property.

■ A public entity is generally protected by sovereign immunity against lawsuits without the public entity's consent. *Spielvogel v. City of Kansas City,* 302

S.W.3d 108, 112 (Mo.App. W.D.2009). However, section 537.600.1(2) waives the sovereign immunity of a public entity where an injury results from a dangerous condition of the public entity's property. *Id.* In order to hold a public entity liable, a plaintiff must prove that:

> (1) a dangerous condition existed on public property; (2) the injury directly resulted from the dangerous condition; (3) the dangerous condition created a reasonably foreseeable risk of the kind of harm incurred; and (4) a public employee negligently created the condition or the public entity had actual or constructive notice of the condition.

*Hale ex rel. Hale v. City of Jefferson,* 6 S.W.3d 187, 193 (Mo.App. W.D.1999). The dangerous condition alleged "must 'describe, define, explain, denote or reference only and exclusively the physical defects in, upon and/or attending to property of the public entity.' " *State ex rel. Div. of Motor Carrier & R.R. Safety v. Russell,* 91 S.W.3d 612, 616 (Mo. banc 2002) (quoting *Twente v. Ellis Fischel State Cancer Hosp.,* 665 S.W.2d 2, 12 (Mo. App. W.D.1983)). Missouri courts have interpreted the phrase "dangerous condition" to include "both defects in the physical condition of public property and physical deficiencies created by the placement of objects on the public property." *Boever v. Special Sch. Dist. of St. Louis Cnty.,* 296 S.W.3d 487, 493 (Mo.App. E.D. 2009); *see also Alexander v. State,* 756 S.W.2d 539, 541–42 (Mo. banc 1988) (holding that a dangerous condition may be created by the positioning of various items of property in relation to one another rather than by an intrinsic defect in the property).

Rodgers argues that, based on the holding of *Alexander,* there need not be a physical defect in the property, but rather, a combination of conditions placed on or within a public entity's property may constitute a dangerous condition as contemplated by section 537.600.1(2). Therefore, Rodgers asserts that NKC Hospital created a dangerous condition when it placed locks on the doors of its examination rooms and when it allowed Price, who had previously been accused of inappropriately touching a female patient, to perform intimate procedures on a female patient in a locked room without a chaperone.

Rodgers relies primarily on *Alexander* to support her theory. In that case, a public employee had placed a folding room partition at the foot of a ladder the plaintiff was using while repairing an elevator. 756 S.W.2d at 540–41. When the plaintiff descended the ladder, he stepped on the partition, which unfolded and caused the plaintiff to fall and sustain injuries. *Id.* The Missouri Supreme Court noted that while neither the ladder nor the partition was intrinsically defective, the positioning of the items of property "created a physical deficiency in the state's property which constituted a 'dangerous condition.' " *Id.* at 542.

Rodgers also relies on a more recent Missouri Supreme Court case addressing the same issue. *See Cain v. Mo. Highways & Transp. Comm'n,* 239 S.W.3d 590 (Mo. banc 2007). In that case, the plaintiff was injured by a falling tree, which had been cut down by public employees. *Id.* at 593. The Court found that the case was analogous to *Alexander,* noting that there was nothing intrinsically dangerous about the tree. *Id.* at 594. However, the Court found that "the manner in which the [employee] cut the tree, prior to it falling, created a dangerous condition within the meaning of [section 537.600.1(2) ]." *Id.*

Rodgers interprets the holding of *Alexander* to require her to prove only that the City set up or placed a "combination of conditions" on or within its property in a

way that created a dangerous condition. Although both *Alexander* and *Cain* clearly hold that the property itself need not be inherently defective, they do not interpret the phrase "dangerous condition" so broadly as to encompass the circumstances underlying Rodgers's claim. Rodgers does not allege, as was the case in *Alexander*, that the City or its employees negligently placed various items of property in a manner that created a dangerous condition. Rather, she essentially claims that Price was allowed to have access to certain property, i.e., medications and a door with a lock on it, which may have made it easier for him to engage in criminal conduct. The "placement" of Price in relation to non-defective property is not the equivalent of the circumstances contemplated in *Alexander*.[1]

Furthermore, Rodgers's claims are not supported by the Court's holding in *Cain*. Rodgers argues that her case is similar to *Cain* in that her injury was the result of the manner in which public employees interacted with property, specifically that NKC Hospital installed locks on its examination room doors and that Price administered medications to Rodgers and locked the door of the examination room. Although the Court in *Cain* found that the manner in which the public employee cut the tree created a dangerous condition, the plaintiff's injury was ultimately a result of the tree, i.e., an item of property, falling on her. In this case, Price did not use the medications, the door, or the lock on the door in such a way that any of those objects directly injured Rodgers. Furthermore, Rodgers does not assert that the medications, the door, or the lock on the door caused her injuries. Rather, she merely alleges that the City's property provided the site upon which Price's injuri-

ous conduct occurred, and the various items of property made it easier for Price to engage in criminal conduct. If the events occurred as described by Rodgers, her injuries resulted from Price's conduct and not from a physical defect of the City's property or a physical deficiency created by the positioning of various items of property.

Because we find that the facts alleged by Rodgers do not, as a matter of law, constitute a dangerous condition as contemplated in section 537.600.1(2), Rodgers's claim against the City is barred by sovereign immunity, and the trial court did not err in granting the City's motion for summary judgment. Rodgers's first point is denied.

■ In her second point on appeal, Rodgers contends that the trial court erred in granting summary judgment in favor of Cash, Johnston, and Menninga because genuine issues of material fact existed as to whether they each owed a duty of care to Rodgers. Rodgers claims that because they owed a duty to her, the public duty doctrine does not apply to shield them from liability.

■ Under the public duty doctrine, "a public employee is not civilly liable for the breach of a duty owed to the general public, rather than a particular individual." *Southers v. City of Farmington*, 263 S.W.3d 603, 611 (Mo. banc 2008). Thus, the doctrine "is based on the absence of a duty to the particular individual, as contrasted to the duty owed to the general public." *Id.* An exception to this rule exists where the public employee has breached a ministerial duty in which the injured party had a special, direct, and distinctive interest. *Id.* at 612. If the public duty doctrine applies, it "negates the duty ele-

1. Rodgers admitted during the discovery process that the door of the examination room, the lock on the door, and the medications functioned as they were intended to.

ment required to prove negligence, such that there can be no cause of action for injuries sustained as the result of an alleged breach of public duty to the community as a whole." *Id.*

Rodgers claims that the public duty doctrine is inapplicable because Cash, Johnston, and Menninga owed her a duty as a patient to whom they rendered health care, either directly or indirectly. However, Rodgers cannot show that any of the defendants were involved in treating her the night she came to the ER. Neither Rodgers nor her husband recalls seeing any of the defendants the night Rodgers went to the ER. All three defendants stated that they were not present at the hospital during Rodgers's visit to the ER. Rodgers claims that only an ER physician, Dr. Hugh Ryan, and Price assessed her, administered medications, and performed procedures while she was in the ER. Therefore, the facts do not demonstrate that any of the three defendants directly treated Rodgers.

Furthermore, the nature of the job functions of Cash, Johnston, and Menninga indicate that they did not owe a duty to Rodgers in particular but, rather, owed a duty to the general public. As the vice president of human resources, Johnston had oversight responsibility for issues relating to pay, benefits, employee relations, hiring, and policy development. As a member of NKC Hospital's senior management, part of Johnston's job was to advise the hospital president and management staff regarding personnel policies and procedures and to participate in the development and implementation of such policies and procedures. Johnston was not a healthcare practitioner.[2] Cash, who served as NKC Hospital's director of criti-

cal care and cardiovascular services, was responsible for the overall management of several departments, including the emergency department, three telemetry areas, three intensive care areas, outpatient cardiology and neurology services, and a coagulation clinic. Menninga was the nurse manager of NKC Hospital's emergency department and was responsible for hiring, firing, and the supervision of staff. Menninga was also responsible for operations of the department such as budgeting, scheduling, staffing, and communication with other NKC Hospital departments, physicians, and outside agencies.

Based on the nature of each defendant's responsibilities and the fact that they did not provide treatment to Rodgers or have any direct contact with her prior to or during the incident, we find that the defendants owed a duty to the general public rather than to Rodgers in particular. Cash, Johnston, and Menninga's operation and management of their respective departments was for the benefit of the community as a whole and was not particularized to Rodgers. Moreover, Rodgers's interest in hospital employees following procedures, the efficient operation of the hospital, adequate and competent staff, the supervision of hospital staff, and safety when being treated by hospital staff is indistinct from the interest of the general public. The circumstances here are similar to several Missouri Supreme Court cases addressing the public duty doctrine. *See, e.g., Southers,* 263 S.W.3d at 621 (finding that the public duty doctrine applied to a supervising police officer and the chief of police where the duties to supervise other officers, implement procedures and policies, and train other officers were owed to the general

---

2. Although Cash and Menninga were both registered nurses, they did not provide treat-

ment for Rodgers in that capacity.

public); *State ex rel. Howenstine v. Roper*, 155 S.W.3d 747, 755 (Mo. banc 2005), *abrogated on other grounds by Southers*, 263 S.W.3d 603 (finding that the duties of a medical director to improve the operations, treatment, and training at a clinic were not particularized to any patient but, instead, to the public); *State ex rel. Barthelette v. Sanders*, 756 S.W.2d 536, 538 (Mo. banc 1988) (finding that the public duty doctrine applied to the superintendent of a state park where his duty regarding safety measures was owed to the public rather than to the plaintiff in particular because the plaintiff's "interest in the safety of the park was indirect and indistinct from that of the public as a whole").[3]

Since the public duty doctrine applies to Cash, Johnston, and Menninga, the duty element of Rodgers's negligence claims is negated, and she cannot maintain a cause of action for injuries resulting from an alleged breach of a public duty owed to the general public. Therefore, the trial court did not err in granting summary judgment in favor of Cash, Johnston, and Menninga.

The judgment of the trial court is affirmed.

All concur.

---

3. We further note that this case does not fall under the "breach of a ministerial duty" exception to the public duty doctrine where the managerial and supervisory functions of the three defendants involved highly discretionary decisionmaking. *See Southers*, 263 S.W.3d at 621 (finding that supervisory conduct and policy decisions are highly discretionary functions that the public immunity doctrine is intended to shield); *see also Bates v. State*, 664 S.W.2d 563, 565–66 (Mo.App. E.D.1983) (finding that administrative policy decisions regarding the screening of employees, employee and patient supervision, and the intermingling of employees and patients were discretionary decisions).