NUMBER 13-02-360-CV

 

                                            COURT
OF APPEALS

 

                                 THIRTEENTH
DISTRICT OF TEXAS

 

                                    CORPUS
CHRISTI - EDINBURG

 

 

 

RANDALL S. ZANE, M.D. 

AND MICHAEL J. BURKE,
M.D.,                                                    Appellants,

 

                                                             v.

 

KELLY BROOKE SURBER, INDIVIDUALLY, AND 

ON BEHALF OF THE ESTATE OF WILLIAM 

TATE SURBER, DECEASED, AND AS NEXT 

FRIEND OF LOREN BAILEY SURBER AND, 

NICHOLAS TATE SURBER,
MINORS,                                           Appellees.

 

 

 

                              On
appeal from the 28th District Court

                                        of
Nueces County, Texas.

 

 

 

                                 DISSENTING
OPINION








 

                    Before Justices Hinojosa,
Yañez and Castillo

                             Dissenting
Opinion by Justice Castillo

 

 

With respect to Dr. Burke's first issue presented, I
would hold that the evidence is legally insufficient to prove the standard of
care and breach of that standard.  With
respect to Dr. Zane's seventh issue presented, I would hold that the record
demonstrates prima facie harm. 
Accordingly, I respectfully dissent. 


I.  Background








Twenty-six 
years old at the time, Mr. Surber presented to Dr. Brandt with advanced,
progressive sinus disease that by that time had led to blindness in one
eye.  After a CT scan and an MRI, Mr.
Surber underwent surgery for, in part, removal of diseased tissue and polyps to
facilitate breathing, among other things. 
Dr. Burke assisted Dr. Brandt to stop a bleeder during the surgery.  After release from the hospital, Mr. Surber
subsequently presented for emergency treatment because of a bleed (hereafter,
the "October 3" episode).[1]  On call for Dr. Brandt, Dr. Zane reviewed the
MRI and CT scans taken at the initial hospitalization.  Prior to surgery, Dr. Zane conferred by
telephone with Dr. Burke regarding the first surgery bleed and, during surgery,
located the bleeder and contained it. 
Dr. Burke was not part of the surgical team for the October 3rd surgery
or for follow up to that surgery.[2]  Subsequently, Mr. Surber appeared for a
previously set appointment with Dr. Burke for removal of surgical staples from
the first surgery, but the staples had already been removed.[3]  Mr. Surber apprised Dr. Burke of the events
leading to the second surgery and his current 
symptoms.  Dr. Burke  released him from his care.  Several days later, Mr. Surber suffered
another bleed at home and expired en route to the hospital.  Suit was brought and the case was tried to a
jury on issues of medical negligence.  

After an adverse jury verdict, Dr. Zane and Dr.
Burke present several issues for our decision. 
Those issues include whether reasonable minds could differ on the
proximate cause of Mr. Surber's death. 
With regard to Dr. Zane and Dr. Burke, appellants maintain that they
should have performed an arteriogram because it is foreseeable to an
otolaryngologist and a neurosurgeon, respectively,  that failing to order an arteriogram will
result in the failure to determine the existence or not of an aneurysm or
pseudo-aneurysm in an artery.  They
additionally argue that had an arteriogram been performed, the doctors could
have seen a defect in an artery[4]
and taken steps to prevent the fatal bleed. 








Appellees state that they "contended that
Appellants should have performed an angiogram[5]
after the second surgery, on October 3." (Emphasis original).  Appellees recognize that, to show proximate
cause, they must have shown that the arteriogram, if performed, would in
reasonable medical probability have resulted in the institution of medical
treatment which would have prevented Mr. Surber's death.[6]  They contend that they have done so by the
testimony of their experts because they need only prove that a physician using
reasonable prudence could have foreseen that Mr. Surber would suffer a
hemorrhage if an arteriogram were not performed and the defect in the artery
corrected.  

II.  Dr. Burke[7]








By his first issue, 
Dr. Burke asserts that the evidence does not prove the standard of care
and that he breached any standard of care. 
Dr. Burke asserts that he had no duty to order an arteriogram because he
did not participate in the October 3 surgery or treatment, was not consulted,
and did not make any decisions with regard to that surgery or whether an
arteriogram was indicated.  Appellees
counter that if Dr. Burke and Dr. Zane had acted prudently under the
circumstances (including  Mr. Surber's
likely anatomical abnormality due to advanced sinus disease), they probably
would have prevented Mr. Surber's death by performing " an arteriogram
which would probably have revealed whatever defect existed."  Appellees maintain that they did not have to
prove which defect existed because an arteriogram "would probably have
revealed it, whatever it was."  They
further posit that, even if one arteriogram failed to reveal a defect, the
standard of care required sequential arteriograms, indicated by the two
bleeds.  In particular, as to Dr. Burke,
appellees contend that, when Mr. Surber presented to him for follow-up after
the second bleed, Dr. Burke was required to order an arteriogram. 

A.  Scope and
Standard of Review     








A contention that there is no evidence of an
applicable standard of care in a health care liability suit is a granulation of
the contention that there is no evidence of negligence.  Battaglia v. Alexander, 177 S.W.3d
893, 899 (Tex. 2005).  One element
required to prove a medical negligence claim is evidence of the applicable
standard of care, which usually requires expert testimony.  Id.; Hart v. Van Zandt, 399
S.W.2d 791, 792 (Tex. 1966).  Therefore,
in our review of the record we must consider both the evidence of negligence
and the more specific subsidiary question of whether a standard of care was
established.  See Battaglia, 177
S.W.3d at 899.  The medical  standard of care must be established so that
the fact finder can determine whether the physician's act or omission deviated
from the standard of care to the degree that it constituted negligence or
malpractice.  See Rodriguez v.
Reeves, 730 S.W.2d 19, 21 (Tex. App.BCorpus Christi 1987, writ ref'd n.r.e.).  The plaintiff must establish from expert
testimony (1) the standard of care, and (2) the facts which show that the
physician  deviated from that
standard.  Id.  It necessarily follows that she must also
show that the decedent's death was proximately caused by such deviation.   Id. 
The fact finder would then decide whether the deviation was of such
degree that it constituted negligence or malpractice.  Id. 

The burden of proof, then, in a medical malpractice
case is on the patient to prove that the physician has undertaken a mode or
form of treatment which a reasonable and prudent member of the medical
profession would not have taken under the same or similar circumstances.  Bauer v. King, 700 S.W.2d 650, 651
(Tex. App.BCorpus Christi 1985, no writ) (citing Hood v.
Phillips, 554 S.W.2d 160, 165-66 (Tex. 1977)).








It is the jury's role to judge the credibility of
the evidence, to assign the weight to be given to testimony, and to resolve
inconsistencies within or conflicts among the witnesses' testimony.  Owens v. Perez, 158 S.W.3d 96, 110
(Tex. App.BCorpus Christi 2005, no pet.).  In determining the sufficiency of the
evidence, appellate courts must accept the jury's resolution of any conflicts
or inconsistencies in the evidence.  Id.  In reviewing a verdict for legal sufficiency,
we credit evidence that supports the verdict if reasonable jurors could, and
disregard contrary evidence unless reasonable jurors could not.  City of Keller v. Wilson, 168 S.W. 3d
802, 827 (Tex. 2005).             In this
case, Dr. Burke did not bear the burden of proof at trial.  See Holloway v. Skinner, 898 S.W.2d
793, 795-96 (Tex. 1995); see also Kingston, 82 S.W.3d 755, 763 n. 3
(Tex. App.BCorpus Christi 2002, pet. denied). Thus, we analyze
his legal‑sufficiency challenge in his first issue as a no‑evidence
issue. See Gooch v. Am. Sling Co., 902 S.W.2d 181, 183 (Tex. App.BFort Worth 1995, no writ).  Dr. Burke must show that the record presents
no evidence to support the adverse finding. See Croucher v. Croucher,
660 S.W.2d 55,  58 (Tex. 1983).  Specifically, he must show that the record
presents no probative evidence to support the essential facts as to the
applicable standard of care and breach of that standard.  See Holloway, 898 S.W.2d at 795; see
also Merrell Dow Pharms., Inc. v. Havner, 953 S.W.2d 706, 711 (Tex. 1997);
Hines v. Comm'n for Lawyer Discipline, 28 S.W.3d 697, 701 (Tex. App.BCorpus Christi 2000, no pet).  

B.  The Record








Appellees recognize that they must have shown proof
of a standard of care and breach of that standard.  They maintain they have done so by the
testimony of their experts, Drs. Gates, Mattox, and Garza-Vale.  Appellees concede that their experts, Drs.
Gates and Mattox, admitted that Dr. Burke was not negligent in failing to
perform an arteriogram on October 3 because he was not present.  Appellees assert, however, that Dr. Burke had
an "independent responsibility" to order an arteriogram in view of
Mr. Surber's pathology and history.[8]  Appellees refer to Dr. Garza-Vale's testimony
as follows:

Q. . . . [D]o you believe that the standard of care
required all of these Defendants to perform an angiogram after the October 3rd
'98 bleed, serially, if necessary, anytime up until the time of his death?

 

A.  Certainly
I think it would have been the prudent thing to do. . . .  And it is at that point that I think it is
mandatory to do an arteriogram.  

 

Dr. Garza-Vale did not testify that the standard of
care was that Dr. Burke had an independent responsibility to order an
arteriogram or serial arteriograms when Mr. Surber presented with symptoms of
vertigo after the October 3 bleeding episode. 
Even assuming that his testimony suffices, in the context of Dr. Burke's
care, Dr. Garza-Vale later testified as follows:[9]

Q. . . . Now, I want to visit with you a little bit
about Dr. Burke, if I can.  When I first
talked to you about Dr. Burke B and I think you conceded that today you don't have
any criticism of that first [surgery] at all, do you?

 

A.  No, sir.

 

Q.  Nor any
criticism of what he reported to Dr. Zane. 
That would be appropriate because that is what he thought he saw.








 

A.  Yes.

 

Q.  All
right.  Now, you know they had a
conversation before he went into surgery. 
. . . .  Now, he wasn't at the
hospital at the time. . . . [Y]ou agreed with me that under those circumstances
where if he wasn't at the hospital, he could rely upon the physicians at the
hospital to make a decision about whether an arteriogram was necessary.

 

A.  Yes, sir.
. . .  And I said given those
circumstances, yes, I would agree with you.

 

Q. . . .  And
you believe . . . that the decision about whether or not there should have been
an arteriogram should have been done at the time of that hospitalization?

 

A.  Yes,
sir.  My opinion was that the arteriogram
should have been done on that second hospitalization.

 

Q.  Okay.  And remember the first time I asked if [Dr.
Burke] was not at the hospital, you weren't criticizing him for not doing an
arteriogram, and you agreed.

 

A.  Yes,
sir.  I believe that is the testimony.

 

Q.  And you
didn't have any other criticisms when I asked you all of the questions.  Is that correct?

 

A.  That is
correct.

 

Q.  Is that
still your testimony today?

 

A.  Yes, sir,
presuming again, those facts were correct.

 








When asked if the standard of care required
"all of the defendants to perform an angiogram . . . serially if
necessary" after the October 3 bleed "anytime up until the time of
his death," Dr. Garza-Vale testified that "it would have been the
prudent thing to do."  However, in
the context of the breach of the proffered standard of care, Dr. Garza-Vale did
not offer opinions critical of Dr. Burke. 
Moreover,  Dr. Burke was not at
the hospital during, and not otherwise involved, in the October 3 surgery, the
point in time Dr. Garza-Vale testified it was mandatory to do an
arteriogram.  Dr. Garza-Vale did not
testify that Dr. Burke breached the mandatory standard of care.  He also did not testify that Dr. Burke
breached any standard of care for serial arteriograms.[10]  








Appellees also point to Dr. Gates's testimony.  However, Dr. Gates testified he was "critical
of the team that failed this patient" but did not have an opinion as to
Dr. Burke and the October 3 episode.  He
did not testify that Dr. Burke had an independent responsibility to order an
arteriogram.  The evidence does not
demonstrate that Dr. Burke was a member of the surgical team for the October 3
episode.[11]  Dr. Gates testified he knew Dr. Garza-Vale
and further testified as to the latter's opinion of Dr. Burke:

Q.  And [Dr.
Garza-Vale] would be familiar with what would be expected of a reasonably
careful neurosurgeon under circumstances similar to this?

 

A.  I believe
so.

 

Q.  And you
would trust his judgment with regard to neurosurgical standards, wouldn't you?

 

A.  Well,
assuming things hadn't changed from when I knew him before.

 

As indicated above, Dr. Garza-Vale did not testify
that Dr. Burke breached a standard of care. 
He did not criticize Dr. Burke. 
Dr. Gates testified he trusted Dr. Garza-Vale's judgment as to the
neurosurgical standard of care.  The
record does not demonstrate that Dr. Gates was specifically questioned as to
whether Dr. Burke had an independent responsibility to order an arteriogram or
serial arteriograms; rather, Dr. Gates testified that the team failed Mr.
Surber.  Dr. Gates also did not testify
that Dr. Burke breached  the standard of
care.








Similarly, the record demonstrates that Dr. Mattox
did not testify as to a standard of care or a breach of the standard of
care.  Outside the jury's presence,  the trial court sustained the defense's objection
on grounds Dr. Mattox is a surgeon and not qualified to testify as to the
standard of care as to a neurosurgeon. 

C. 
Application

One element to prove a medical negligence claim is
evidence of the applicable standard of care, which usually requires expert
testimony.  Battaglia, 177 S.W.3d
at 899.  The standard of care must first
be established so that the fact finder can determine if the doctor's conduct
deviated from the standard to the degree that it constituted malpractice.  Moreno v. M.V., 169 S.W.3d 416, 420‑21
(Tex. App.BEl  Paso 2005,
no pet.); Bauer, 700 S.W.2d at 651. 
It is not sufficient for a medical expert to simply state that he knows
the standard of care and to then draw a conclusion as to whether that standard
was met.  Moreno, 169 S.W.3d at
420-21.  Rather, the expert must
explicitly state the standard of care and explain how the defendant's acts met
or failed to meet that standard.  Id.;
Bauer, 700 S.W.2d at 651. 








In this case, Dr. Garza-Vale was not critical of Dr.
Burke.  He unequivocally testified that
the arteriogram was mandatory on October 3, when Dr. Burke was not
present.  Dr. Garza-Vale and Dr. Gates
did not provide a standard of care for Dr. Burke's independent responsibility
to order an arteriogram.  Similarly, they
did not provide a standard of care that Dr. Burke order serial arteriograms in
the context of either the October 3 episode or any independent responsibility
after that time.  Appellees' experts'
testimony does not satisfy the threshold question of what standard is used by
which to measure the physician's acts or omissions.  See Rodriguez, 730 S.W.2d at
21.  

Even assuming that the evidence presented by
appellees' experts, collectively or individually, established a standard of
care applicable to an independent responsibility to order an arteriogram or
serial arteriograms, the experts did not testify that Dr. Burke breached either
one to the degree that it constituted malpractice.  Moreno, 169 S.W.3d at 420-21.  Because there is no evidence to show that the
conduct of the physician violated or breached the standard of care, I would
hold that the evidence is legally insufficient to prove standard of care and breach
of a standard of care.  See Rodriguez,
730 S.W.2d at 21.  Accordingly, I would
sustain Dr. Burke's first issue. 
Respectfully, because resolution of the issue would be dispositive, I do
not address his remaining issues.  See
Tex. R. App. P. 47.1.  

III.  Dr. Zane








By his seventh issue, Dr. Zane asks us to decide
whether the trial court erred in overruling his properly preserved complaints
as to opposing counsel's letter published in the local newspaper on the third
day of trial.[12]  Dr. Zane asserts that the letter improperly
criticized physicians as dishonest and committing malpractice without
consequence.  He complains that the
letter amounted to jury tampering and was prima facie prejudicial.

Dr. Zane assigns error to both the denials of the
motion for mistrial on grounds of attorney misconduct and the motion for new
trial on grounds of juror misconduct.  He
maintains that prejudice from the letter alone could be presumed and the
testimony from one juror post-trial shows that prejudice indeed existed.  Appellees respond that the trial court did
not abuse its discretion in denying the motion for new trial.  The majority decides that the bare presence
of the letter is insufficient to establish prima facie harm.  Respectfully, I disagree.

A.  Relevant
Facts

The jury trial involved both Dr. Burke and Dr.
Zane.  After the jurors were impaneled
and sworn, the trial court admonished that jurors were "not to seek
information contained in law books, dictionaries, public or private records,
including the Internet these days, including any newspaper, television, radio
broadcasts, which is not admitted in evidence."  On the morning of the third day of trial when
counsel's letter was published, Dr. Zane moved for a mistrial on grounds, in
part, that the letter constituted an inappropriate ex parte communication with
the jury to improperly influence them and posited,  "We can hardly imagine that we could get
a fair trial from this point forward as the result of this . . . letter to the
editor."   








Opposing the motion for mistrial, appellees
responded that Dr. Burke had appeared on the front page of the same newspaper a
few weeks before trial "to affect what goes on in this
courtroom."  They added that the letter
was in response to that article and argued, "[A]bsent Dr. Burke appearing
on the front page of the paper, complaining of being sued too much and
complaining of malpractice suits generally, this letter would never have been
written."  They further argued, "Once
[Dr. Burke] has allowed the paper to run the picture and to run the article, we
are damaged in a way that the Court cannot repair."   

Some discussion ensued as to a media war on the
question of medical malpractice in the community.  The letter's author stated that he wrote it
as a response "immediately upon reading Dr. Burke's article."  The trial court stated that it was
inappropriate for "either party to be doing their war in the
newspaper."  Subsequently, the trial
court stated it might question the jury regarding whether they had read the letter.  Appellees argued that it "would just
bring it to their attention. . . . they will just go pick up the paper tonight,
if they haven't read it already." 
Appellees stated that prejudice, if any, was to appellees.  Appellees argued, "[T]his jury is smart
enough to B hopefully, will weigh the things they read in the
paper and what they hear on the radio and television and judge this case on the
merits."

The trial court recalled it had admonished the jury
not to read newspaper articles.  The
trial court admonished the parties to "not do further harm, potential
harm" and denied Dr. Zane's motion for mistrial.








The parties do not dispute that the article
featuring Dr. Burke appeared two and a half weeks before trial.  The record does not demonstrate that Dr. Zane
was involved in, with, or through the media, either offensively or defensively.

B.  The Law

A trial court's denial of a motion for mistrial is
reviewed under an abuse of discretion standard. 
Till v. Thomas, 10 S.W.3d 730, 734 (Tex. App.BHouston [1st Dist.] 1999, no pet.).  The test for abuse of discretion is whether
the trial court acted without reference to any guiding rules and principles or,
in other words, whether the act was arbitrary or unreasonable.  Downer v. Aquamarine Operators, Inc.,
701 S.W.2d 238, 241‑42 (Tex. 1985). 
The mere fact that a trial court may decide a matter within its
discretionary authority in a different way than an appellate judge in a similar
circumstance does not demonstrate that an abuse of discretion has occurred.  Id. at 242.








Every claim of jury prejudice because of media
attention appearing during a trial must turn on its own facts.  See Ladner v. State, 868 S.W.2d 417,
423 (Tex. App.BTyler 1993, pet. ref'd) (citing Marshall v.
United States, 360 U.S. 310, 312 (1959)). 
An overt act may be the most compelling factor to show prejudice.  Texas Employers' Ins. Ass'n v. McCaslin,
159 Tex. 273, 275 (Tex. 1958).  There is
no requirement that the party asserting error must show injury beyond a
reasonable probability in order to secure a reversal of a judgment.  McCaslin, 159 Tex. at 275.  There 
are some types of misconduct that are so highly prejudicial and inimical
to a fair trial that probable injury can be assumed, and the burden of proving
probable injury is met, prima facie at least, by simply showing the improper
act and nothing more.  See  Strauss v. Cont'l Airlines, Inc., 67
S.W.3d 428, 448 (Tex. App.BHouston [14th Dist.] 2002, no pet.) (finding no harm
in improper communication with juror because the juror voted in appellant's
favor).   

C. 
Application

The letter stated, "The repercussions for the
patients are far more severe and often result in death."  Thus, it touched on the health care claim
against Dr. Zane.  The letter also
stated, "The malpractice problem is further exacerbated when fellow
physicians fail to come forward and honestly testify in malpractice cases against
malpracticing doctors, even when the malpractice is obvious."  Thus, it also touched on the credibility of
the doctors testifying in defense of the claim, including Dr. Zane both as a
defendant and a "fellow physician" of Dr. Burke.  The sole defense in support of the  letter was that it was in response to the
article featuring Dr. Burke.  Appellees
conceded that they were "damaged in a way that the Court cannot
repair" by the article featuring Dr. Burke that appeared over two weeks
before trial.  I conclude that the letter
published in the midst of trial was no less harmful to Dr. Zane. 








The record does not demonstrate that Dr. Zane was
directly involved with the pre-trial article featuring Dr. Burke.  The letter touched on the claims against
which Dr. Zane must defend.  By admonishing
that the parties not do "further harm," the trial court implicitly
found the published letter demonstrated prima facie harm.  I would hold that the trial court's implicit
finding is supported by this record.  Ladner,
868 S.W.2d at 423;  McCaslin, 159
Tex. at 275.  Accordingly, I would also
hold that the trial court abused its discretion by denying Dr. Zane's motion
for a mistrial.  Downer, 701
S.W.2d at 241‑42.  I would sustain
Dr. Zane's seventh issue presented.  

IV. 
Conclusion

Absent proof of a standard of care or breach of that
standard, I would sustain Dr. Burke's first issue presented.  Finding the record demonstrates that opposing
counsel's letter demonstrates prima facie harm, I would sustain Dr. Zane's seventh
issue presented.   Thus, I respectfully
dissent.

 

ERRLINDA CASTILLO

Justice

 

Dissenting Opinion delivered and filed

this the 8th day of June, 2006.

 











[1] Three key dates are material.  On September 25, 1998, Dr. Brandt and  Dr. Burke performed surgery.  On October 3, 1998, Dr. Zane performed a
second surgery.  On October 15, 1998, Dr.
Burke had a post-operation visit with Mr. Surber with respect to the September
25, 1998 surgery.  





[2] In a civil case, we accept as true
the facts stated unless another party contradicts them.  See Tex.
R. App. P. 38.1(f).  





[3] On the same day, Mr. Surber saw
Dr. Brandt.  





[4] In their brief, appellees maintain
that it is not essential to the judgment that the evidence support a finding
that the ICA was the artery involved and assert that the doctors were negligent
regardless of which artery hemorrhaged. 
Appellees' experts appeared to agree that the stage of the disease had
compromised Mr. Surber's vascular system. 
As to the first surgery, Dr. Garza-Vale conceded that the doctors
involved would be in the best position to know whether a major vessel
bled.  





[5] The jury heard that the terms
angiogram and arteriogram are synonymous.





[6] Without reference to the record,
appellees state that, even if an arterial defect would not appear on the
arteriogram immediately after the injury, the injury that caused the defect in
this case occurred on September 25, during the first surgery. 





[7] Dr. Burke presents three
issues:  

 

1. 
There was no evidence or, alternatively, insufficient evidence to
support the jury's finding that he was negligent.  

(a) appellees failed to establish
Dr. Burke's duty to act according to a certain standard of care; and 

(b) appellees failed to establish
that he breached the applicable standard of care.

2. 
The evidence was legally and factually insufficient to support the
proximate cause finding of the jury. 
Testimony by appellees' experts was legally and factually insufficient
to support the proximate cause finding because it was unreliable.

3. 
Jury misconduct in this case warrants a new trial.  Improper jury contact in this case was
harmful error as a matter of law and requires that the Court grant a new trial.   

 





[8] In their brief, appellees assert:

 

[I]f [Mr. Surber] had presented to
Burke with those symptoms before the second bleed, Burke would not have
been required to perform an angiogram. 
But on October 15, 1998, when [Mr. Surber] presented to Burke for
follow-up, after the second bleed, Burke was required to order an
angiogram.  Burke was negligent in not
doing so.

 

(Emphasis original).  





[9] Dr. Garza-Vale testified that he
did not know that Dr. Burke was not at the hospital on October 3, or that Dr.
Burke talked to Dr. Zane by telephone before Dr. Zane actually "went in to
see the vessel" that day, or that Dr. Burke told Dr. Zane to call him if
he needed him. 





[10] The question was directed to both
an independent responsibility to order an 
an arteriogram and serial arteriograms. 
Dr. Garza-Vale testified an arteriogram was mandatory on October 3 but
he did not address  serial
arteriograms.  Importantly, Dr. Garza-Vale
had previously testified that serial arteriograms were required after the
October 3 episode.  He testified as follows:

 

Q. 
The records that the jury will have in the case indicate that on October
the 15th of '98, Tate returned to the offices of Dr. Brandt and Dr. Burke for
follow-up visits.  Assume with me that
the records show that on those visits Tate had a dizzy B a complaint of dizziness,
weakness, lightheadedness and had nausea and he described when he was in the
shower he would get a feeling of dizziness or vertigo.  Would that have been a good time for these
physicians to order an angiogram?

 

A. 
Personally, I would have been worried if he gave me those kind of signs
and symptoms that something was going on in his vascular system, perhaps
instability of the artery or the artery spasming, opening, closing, pressures
varying from moment to moment.  Perhaps
he is even embolizing.  Sometimes what
happens is you have a cap of clot on the outside of the artery; you may have
some inside the artery, too.  So some of
those clots may shower up into the brain and cause some dizziness and
lightheadedness.  As long as they
dissolve, there's a process constantly in the body where you're forming clots
and lysing them or breaking them down. 
That type of history would just worry me.

 

Q. 
Would standard of care require that an angiogram be done with those
complaints?

 

A. 
Well, I don't know that it would necessarily in that circumstance; but,
as I say, I think it would on the second bleed. 
Symptoms of that nature, per se, no; but the bleed, yes.

 

Q. 
So with nothing more than just the fact that on October 3 he bled,
serial angiograms were required from that point on?

 

A. 
I do believe so.  

 

However, in the context of Dr.
Burke's independent responsibility to perform serial arteriograms after not
participating in the October 3 surgery, Dr. Garza-Vale did not answer the
question.  





[11] Dr. Garza-Vale testified that it
was mandatory that an arteriogram be ordered after the October 3 episode.  





[12] In addition to the text of the
letter reproduced in note 4 of the majority opinion, the letter begins as
follows:

 

Bad doctors

Re: "Malpractice Insurance
Goes Under the Microscope" Feb. 10. 
As an attorney who handles medical malpractice cases, I think the
situation described by the Caller-Times writer Naomi Snyder needs
clarification.

 

First, let me say there are many fine physicians
practicing in Corpus Christi.  We as a
community are lucky to have them.  Having
reviewed many cases, I can tell you there are certainly some physicians who
consistently provide poor, substandard care.