Jane GILMORE, Clayton Ray Pickens, Chad Daniel Pickens, and Ernest Ray Pickens, Parent and Next Friend of R.N.P., a Child, Appellants,

v.

SCI TEXAS FUNERAL SERVICES, INC. d/b/a Connally/Compton Funeral Directors, Inc. and A & W Industries, Inc. d/b/a Wilbert Vault Co. of North Texas, Appellees.

No. 10–06–00209–CV.

Court of Appeals of Texas, Waco.

Aug. 15, 2007.

Rehearing Overruled Sept. 11, 2007.

Greg White, Naman Howell Smith & Lee LLP, Waco, for appellants.

Michael G. Cosby, Pakis Giotes Page & Burleson PC, Jean M. Siska, Williams McClure & Parmelee, Fort Worth, for appellees.

Before Chief Justice GRAY, Justice VANCE, and Justice REYNA.

## OPINION

FELIPE REYNA, Justice.

Appellants Jane Gilmore and the Pickens family bring this appeal from a take-nothing judgment rendered in favor of a funeral home and a cemetery vault company arising from an incident at the graveside service for Pam Pickens when a lowering device failed and the casket tipped and fell to the bottom of the vault. Appellants contend in three issues that: (1) the court abused its discretion by denying their motion for new trial in which they

argued that the jury's verdict is against the great weight and preponderance of the evidence on the issues of whether: (a) the funeral home breached its contract, (b) the funeral home was negligent, and (c) they suffered compensable mental anguish damages; (2) the court erred by failing to instruct the jury in the charge that the funeral home was liable for the acts and omissions of the vault company under section 651.408 of the Occupations Code; and (3) the court erred by failing to submit a spoliation instruction in the charge because the vault company discarded the lowering device. We will affirm in part and reverse and remand in part.

## Background

Pam Pickens, who was forty years' old, suffered a series of unexplained seizures which caused her brain function to cease. She was removed from artificial life support only days after she was admitted to the intensive care unit. Her mother Jane Gilmore handled the funeral arrangements.[1]

Gilmore made the arrangements with Connally/Compton Funeral Home. The Connally/Compton representative recommended the "Wilbert Way" to Gilmore, which involves a ceremonial lowering of the casket into a vault and the sealing of the vault at the conclusion of the graveside service. The Wilbert Way is a service provided by the Wilbert Vault Company.

At the graveside service, the pastor stepped aside after he finished a Scripture reading, and two men approached the casket. One of them, Wilbert Vault employee James Turner, attached a pair of vice grips to a lowering device and began lowering the casket into the vault. Several witnesses testified that the lowering device emitted a ratcheting sound which was described by Gilmore's husband as being similar to a winch pulling a boat onto a trailer.[2] As the casket was being lowered, there was a "big boom," and the casket turned sideways and fell an unspecified distance to the bottom of the vault. The casket was partially opened by the impact, Pam's arm was exposed, and several mementos spilled out.

According to the testimony, the peaceful setting suddenly broke into pandemonium. Those in attendance scattered. There were screams. The pastor noticed "a young girl laying out on the ground." According to the Connally/Compton funeral director, "everyone was visibly upset." Several men righted the casket. The pastor had others stand in a line between the vault and the seats to provide a shield for those in attendance. At the funeral director's suggestion, the casket was opened, Pam's body was repositioned, and the mementos were returned to the casket.

After the casket fell, Gilmore was dazed and noncommunicative. Her husband testified that she "turned just as white as your shirt." In her own words, she "was way out there." She does not remember being helped to a car or taken home. She does not remember her pastor coming to visit that night. Because of her condition, Gilmore's husband had to handle family matters for a period of time. He adjusted his work schedule because she was so "distraught" that he did not want "to leave her too long by herself." He discussed the

---

1. Pam had been divorced from Ernest Pickens for 12 years. They had three children: Clay, Chad, and R.N.P., on whose behalf Ernest appears as next friend.

2. According to the Wilbert Vault employee who engaged the lowering device, it "was practically noiseless until the accident happened, and then you could hear the noise of the gears going like the sound of a boat winch."

situation with Connally/Compton representatives in the days after the funeral and arranged for Pam's body to be exhumed, placed in a new casket, and reinterred in a new vault one week after the funeral. Gilmore's condition was such that she could not attend the reinterment. She testified that the screams from the graveside service "are just embedded in my mind."

Pam's oldest son Clay testified that when the casket fell he ran up to see what had happened. He estimated the casket to have opened about eight to ten inches. He saw his mother's body, which did not appear as it had for the viewing earlier in the funeral home. He then turned away and went to be with a group of his friends who had come to the graveside service. From that point, everything was "[j]ust a blur."

Pam's other son Chad testified that when the casket fell he "just stood there kind of shocked. I didn't know what to do. I was just mad." His friends came up to console him. He testified that the family drove to the Gilmores' house afterward, but he did not recall much after that.

Pam's daughter R.N.P. testified that she "[t]ook off running" when the casket fell. She ran out into the cemetery and fell down at some point. Her father and some friends came and helped her up. She did not return to the graveside area, and the only other memory she has from that day is being at the Gilmores' house afterward with the family.

Wilbert Vault had the lowering device taken to its offices in Grapevine "to determine what had gone wrong with it." It was "determined that the device couldn't be repaired," so Wilbert Vault discarded it with other scrap metal.

Gilmore and the Pickenses filed suit against Connally/Compton[3] and Wilbert Vault alleging violations of Chapter 651 of the Occupations Code and of the DTPA, breach of warranty, negligence, breach of contract, and fraud. They alleged that the defendants were liable for each other's conduct under a joint-enterprise theory and alternatively that Connally/Compton was liable for Wilbert Vault's conduct under section 651.408 of the Occupations Code.

The court granted Connally/Compton's and Wilbert Vault's summary-judgment motions on the fraud, DTPA, and breach of warranty claims.

At trial, the jury was charged on the breach of contract and negligence claims as well as the joint-enterprise theory. The jury refused to find that Connally/Compton breached its contract, that Connally/Compton and Wilbert Vault were engaged in a joint enterprise, or that any negligence on Connally/Compton's part was a proximate cause of the occurrence in question. The jury found that Wilbert Vault's negligence was a proximate cause but also found that none of the plaintiffs suffered compensable mental anguish.

### Mental Anguish

Appellants contend as part of their first issue that the court abused its discretion by denying their motion for new trial in which they argued that the jury's refusal to award compensable mental anguish damages is against the great weight and preponderance of the evidence.

■ When an appellant challenges "a jury's failure to award any damages, courts of appeals should apply the principles articulated in *Pool v. Ford Motor Co.*" *Golden Eagle Archery, Inc. v. Jackson,* 116 S.W.3d 757, 775 (Tex.2003) (citing *Pool,* 715 S.W.2d 629, 635 (Tex.1986)).

3. Connally/Compton is a wholly owned subsidiary of SCI Texas Funeral Services, Inc.

The court of appeals must consider and weigh all of the evidence, and can set aside a verdict only if the evidence is so weak or if the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. In doing so, the court of appeals must "detail the evidence relevant to the issue" and "state in what regard the contrary evidence greatly outweighs the evidence in support of the verdict."

*Dow Chem. Co. v. Francis,* 46 S.W.3d 237, 242 (Tex.2001) (quoting *Pool,* 715 S.W.2d at 635).

To recover damages for mental anguish, plaintiffs must produce either:

(1) "direct evidence of the nature, duration, or severity of [plaintiffs'] anguish, thus establishing a substantial disruption in the plaintiffs' daily routine"; or

(2) other evidence of " 'a high degree of mental pain and distress' that is 'more than mere worry, anxiety, vexation, embarrassment, or anger.' "

*Saenz v. Fid. & Guar. Ins. Underwriters,* 925 S.W.2d 607, 614 (Tex.1996) (quoting *Parkway Co. v. Woodruff,* 901 S.W.2d 434, 444 (Tex.1995)); *accord W. Telemarketing Corp. Outbound v. McClure,* 225 S.W.3d 658, 669 (Tex.App.-El Paso 2006, pet. denied); *Dillard Dep't Stores, Inc. v. Silva,* 106 S.W.3d 789, 799 (Tex.App.-Texarkana 2003), *aff'd,* 148 S.W.3d 370 (Tex.2004) (per curiam).

Recovery is warranted in such cases where the plaintiff's mental pain has risen to such a level that it has rendered him or her incapable of dealing with certain everyday activities. For instance, as a result of the mental pain, the plaintiff suffers from a myriad of negative emotions; some of these emotions may manifest themselves in such a way as to make it difficult for the plaintiff to eat, sleep, work, socially interact, or carry on any other activity which, until the time of the alleged injury, he or she could accomplish on a day-to-day basis without difficulty.

*Dillard Dep't Stores,* 106 S.W.3d at 799–800; *accord Ortiz v. Furr's Supermarkets,* 26 S.W.3d 646, 653 (Tex.App.-El Paso 2000, no pet.).

"[E]xcept in certain specific, limited instances," a plaintiff may not recover mental anguish damages in a negligence case if the plaintiff did not also suffer physical injury. *Temple–Inland Forest Prods. Corp. v. Carter,* 993 S.W.2d 88, 91 (Tex.1999). As an exception to this general principle, a plaintiff may recover damages for mental anguish which is:

the foreseeable result of a breach of duty arising out of certain special relationships. These include the physician-patient relationship, perhaps because most physicians' negligence also causes bodily injury, and a very limited number of contracts dealing with intensely emotional noncommercial subjects *such as preparing a corpse for burial,* or delivering news of a family emergency.

*City of Tyler v. Likes,* 962 S.W.2d 489, 496 (Tex.1997) (citing *Pat H. Foley & Co. v. Wyatt,* 442 S.W.2d 904 (Tex.Civ.App.-Houston [14th Dist.] 1969, writ ref'd n.r.e.)) (emphasis added) (other citations omitted); *accord Temple–Inland Forest Prods.,* 993 S.W.2d at 91; *Freeman v. Harris County,* 183 S.W.3d 885, 890 (Tex. App.-Houston [1st Dist.] 2006, pet. denied); *Lions Eye Bank of Tex. v. Perry,* 56 S.W.3d 872, 875–77 (Tex.App.-Houston [14th Dist.] 2001, pet. denied).

These "special relationship" cases generally have three common elements:

(1) a contractual relationship between the parties;

(2) a particular susceptibility to emotional distress on the part of the plaintiff; and

(3) the defendant's knowledge of the plaintiff's particular susceptibility to the emotional distress based on the circumstances.

*Freeman*, 183 S.W.3d at 890; *Lions Eye Bank*, 56 S.W.3d at 877.

The oft-cited decision of the Fourteenth Court of Civil Appeals in *Pat H. Foley & Co. v. Wyatt* is an example of a "special relationship" case involving a funeral home. In *Pat H. Foley & Co.*, the plaintiff sued a funeral home for breach of contract and negligence arising from the funeral home's failure to properly embalm her 23–year–old son's body. 442 S.W.2d at 905.

Near the conclusion of the service the plaintiff indicated her insistence that the casket be opened. All others were then excused except for members of the immediate family. Upon the opening of the casket there emanated from the body of her son a grossly offensive odor. It was this occurrence which gave rise to the damages claimed by the plaintiff. The plaintiff immediately became ill, fainted and received medication. It may fairly be said that the impact of the occurrence occasioned a significant effect upon the sensibilities of the plaintiff.

*Id.*

The funeral home argued that the jury was not authorized to award damages for mental anguish because the plaintiff suffered no physical injury. *Id.* at 906. The court rejected this complaint.

In the instant case, however, the mental anguish is not founded solely in the tortious act of the defendant, it is at least in part based upon their contractual relationship. Secondly, the enumerat-

ed considerations fail for the reasons best set forth in *Lamm v. Shingleton, supra,* "The tenderest feelings of the human heart center around the remains of the dead. When the defendants contracted with plaintiff to inter the body of her deceased husband in a workmanlike manner they did so with the knowledge that she was the widow and would naturally and probably suffer mental anguish if they failed to fulfil [sic] their contractual obligation in the manner here charged. The contract was predominently [sic] personal in nature and no substantial pecuniary loss would follow its breach. Her mental concern, her sensibilities, and her solicitude were the prime considerations for the contract, and the contract itself was such as to put the defendants on notice that a failure on their part to inter the body properly would probably produce mental suffering on her part. It cannot be said, therefore, that such damages were not within the contemplation of the parties at the time the contract was made."

*Id.* at 907 (quoting *Lamm v. Shingleton,* 231 N.C. 10, 55 S.E.2d 810, 813–14 (1949)); *see also Freeman,* 183 S.W.3d at 890 (loss of infant body after autopsy); *Wilson v. Ferguson,* 747 S.W.2d 499, 501–03 (Tex. App.-Tyler 1988, writ denied) (concrete lid dropped on coffin, breaking coffin and damaging concrete liner).

 The following evidence provides some support for the jury's refusal to award mental anguish damages to Gilmore. She does not have any memory of the events which occurred from the moment the casket fell that afternoon until late in the evening. She has not sought counseling or consulted with her pastor about this incident.[4] And she was already

---

4. Expert testimony is not required to recover mental anguish damages. *See Parkway Co. v.*

*Woodruff,* 901 S.W.2d 434, 444 (Tex.1995) (mental anguish may be established from "the

grieving because of Pam's unexpected death.[5]

Conversely, the record contains significant evidence which would support a finding that Gilmore suffered mental anguish because of the occurrence in question. After the casket fell, she was dazed and noncommunicative. She had handled virtually all of the funeral arrangements up to that point, but the events at the graveside service left her so distraught that she could not make the arrangements for Pam's body to be reinterred. Because of her condition, her husband adjusted his work schedule because he did not want "to leave her too long by herself." [6]

■ Thus, the record contains substantial evidence that the emotional trauma caused by the incident made it difficult for Gilmore to "socially interact, or carry on any other activity which, until the time of the alleged injury, [she] could accomplish on a day-to-day basis without difficulty." *See Dillard Dep't Stores*, 106 S.W.3d at 799–800; *Ortiz*, 26 S.W.3d at 653; *see also W. Telemarketing Corp. Outbound*, 225 S.W.3d at 671 (plaintiff felt "crushed," her body "br[oke] down," and she "was confined to her bed" at times); *Robertson County v. Wymola*, 17 S.W.3d 334, 347 (Tex.App.-Austin 2000, pet. denied) (plaintiff described loss as "devastating" and "overwhelming"); *Stevens v. Nat'l Educ. Ctrs., Inc.*, 990 S.W.2d 374, 379 (Tex.App.-Houston [14th Dist.] 1999) (plaintiff felt

"devastated and depressed" and "did not leave her house much"), *pet. denied*, 11 S.W.3d 185 (Tex.2000) (per curiam). Accordingly, we hold that the jury's refusal to award damages to Gilmore for past mental anguish "is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust." *See Doctor v. Pardue*, 186 S.W.3d 4, 19–21 (Tex.App.-Houston [1st Dist.] 2005, pet. denied); *see also Dow Chem. Co.*, 46 S.W.3d at 242.

■ However, there is slight evidence in the record that any of the children suffered compensable mental anguish damages or that Gilmore will suffer compensable mental anguish in the future. Therefore, we hold that the jury's refusal to award damages for these elements of Appellants' claims is not "so against the great weight and preponderance of the evidence that it is clearly wrong and unjust." *See Dow Chem. Co.*, 46 S.W.3d at 242.

## Breach of Contract

Appellants also contend in their first issue that the court abused its discretion by denying their motion for new trial in which they argued that the jury's refusal to find that Connally/Compton breached its contract is against the great weight and preponderance of the evidence. Appellants argue in this regard that the primary breach of contract is Connally/Compton's

claimants' own testimony, that of third parties, or that of experts"); *Beaumont v. Basham*, 205 S.W.3d 608, 615 (Tex.App.-Waco 2006, pet. denied) (same); *accord Clayton v. Wisener*, 190 S.W.3d 685, 697 (Tex.App.-Tyler 2005, pet. denied).

5. *But see Coates v. Whittington*, 758 S.W.2d 749, 752 (Tex.1988) (orig. proceeding) ("a tortfeasor takes a plaintiff as he finds him"); *Owens v. Perez*, 158 S.W.3d 96, 111 (Tex.App.-Corpus Christi 2005, no pet.) (same); *In re*

*Nance*, 143 S.W.3d 506, 512 (Tex.App.-Austin 2004, orig. proceeding) (same).

6. The fact that this disruption in Gilmore's daily activities lasted for only a period of days or weeks does not mean that she did not suffer compensable mental anguish. *See Sun-Bridge Healthcare Corp. v. Penny*, 160 S.W.3d 230, 251–52 (Tex.App.-Texarkana 2005, no pet.) (discussing cases upholding mental anguish damages in which the suffering lasted only moments).

failure to provide the Wilbert Way as contemplated by the parties' contract.

Under the plain language of the written contract, Gilmore purchased a Wilbert Venetian Vault and the "Dignity Heritage Memorial Package" from Connally/Compton for Pam's burial. Although there is no express provision in the contract regarding the purchase of the Wilbert Way, no one disputes that the purchase of this particular vault and the Dignity Heritage Memorial Package includes purchase of the Wilbert Way service. *See Transcontinental Gas Pipeline Corp. v. Texaco, Inc.,* 35 S.W.3d 658, 670 (Tex.App.-Houston [1st Dist.] 2000, pet. denied) (trade usage is admissible to explain contract terms so long as it does not contradict express terms of contract); *see also* TEX. BUS. & COM.CODE ANN. § 1.303(c) (Vernon Supp. 2006), § 2.202(1) (Vernon 1994).

A breach of contract has been defined as "a failure, without legal excuse, to perform any promise that forms the whole *or part* of a contract." 23 SAMUEL WILLISTON & RICHARD A. LORD, A TREATISE ON THE LAW OF CONTRACTS § 63:1 (4th ed.2002) (emphasis added); *accord Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.,* 823 S.W.2d 591, 597 (Tex.1992) ("the failure to perform the terms of a contract is a breach of contract"); *IKON Office Solutions, Inc. v. Eifert,* 125 S.W.3d 113, 130 (Tex.App.-Houston [14th Dist.] 2003, pet. denied) (same).

 Connally/Compton argues that the failure of the lowering device does not constitute a breach of the parties' contract on its part because Wilbert Vault and not Connally/Compton was responsible for the lowering device. We disagree. Section 318(3) of the Restatement (Second) of Contracts provides:

> Unless the obligee agrees otherwise, neither delegation of performance nor a contract to assume the duty made with the obligor by the person delegated discharges any duty or liability of the delegating obligor.

RESTATEMENT (SECOND) OF CONTRACTS § 318(3) (1981); *see Honeycutt v. Billingsley,* 992 S.W.2d 570, 579 (Tex.App.-Houston [1st Dist.] 1999, pet. denied).

Connally/Compton also suggests that Appellants suffered no contract damages from this breach because Connally/Compton wrote off the $8,878 which Gilmore still owed. We likewise reject this assertion. Even assuming a jury determined that Gilmore suffered no actual pecuniary loss, she would at minimum be entitled to nominal damages. *See Centre Equities, Inc. v. Tingley,* 106 S.W.3d 143, 154 n. 7 (Tex. App.-Austin 2003, no pet.); *Hauglum v. Durst,* 769 S.W.2d 646, 651 (Tex.App.-Corpus Christi 1989, no writ); *Fisher v. Westinghouse Credit Corp.,* 760 S.W.2d 802, 808 (Tex.App.-Dallas 1988, no writ).

 It is undisputed that Pam's graveside service did not conclude with a ceremonial lowering via the Wilbert Way as contemplated by the contract. There is no evidence in the record that Gilmore agreed to discharge Connally/Compton from this obligation, notwithstanding Connally/Compton's delegation of this duty to Wilbert Vault. *See Honeycutt,* 992 S.W.2d at 579; RESTATEMENT (SECOND) OF CONTRACTS § 318(3). Therefore, the jury's refusal to find a breach of contract "is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust." *See Dow Chem. Co.,* 46 S.W.3d at 242.

### Negligence

In the last sub-part of Appellants' first issue, they contend that the court abused its discretion by denying their motion for new trial in which they argued that the jury's refusal to find Connally/Compton

negligent is against the great weight and preponderance of the evidence. The primary evidence in the record regarding Connally/Compton's alleged negligence is that: (1) Connally/Compton apparently failed to notify Wilbert Vault ahead of time that Pam's graveside service would employ the Wilbert Way; and (2) the funeral director consented to Wilbert Vault's use of the vice grips to activate the lowering device.[7]

According to the testimony, Wilbert Vault employee Turner had two lowering devices available on the day of Pam's funeral. He used his "primary" lowering device for an earlier funeral at another cemetery, and the "backup" device at Pam's funeral. Turner set up both lowering devices earlier in the day before he was informed that Pam's family had chosen the Wilbert Way. The lowering device was set to lower Pam's casket at a fairly rapid rate, and there was not sufficient time before the graveside service to reset it to a slower rate of descent. Turner

decided to use the vice grips to control its descent and slow it down, though he had never used vice grips in this manner before.[8] The funeral director did not object to this plan.[9] According to Turner, the device was operating properly when the lowering commenced. As the casket descended, however, a gear inside the lowering device broke, and the casket fell.

■ Assuming without deciding that a "reasonable funeral director" would have given Wilbert Vault earlier notice that Pam's family had chosen to use the Wilbert Way and that Turner would have thus set the device to lower the casket at a slower rate, there is no evidence in the record that the lowering device would not have failed under these different circumstances. See LMB, Ltd. v. Moreno, 201 S.W.3d 686, 688 (Tex.2006) ("The test for cause-in-fact, or "but-for" causation, is whether (1) the act or omission was a substantial factor in causing the injury and (2) without the act or omission the harm

---

**7.** Appellants devote much attention in their brief to evidence regarding the duty Connally/Compton owed Appellants. Connally/Compton does not dispute the duty element of Appellants' negligence claim. Nevertheless, we focus on the lack of evidence that any act or omission on Connally/Compton's part was a proximate cause of damages to Appellants. See LMB, Ltd. v. Moreno, 201 S.W.3d 686, 688 (Tex.2006) ("The proximate cause element has two components: cause-in-fact and foreseeability. The test for cause-in-fact, or "but-for" causation, is whether (1) the act or omission was a substantial factor in causing the injury and (2) without the act or omission the harm would not have occurred.").

**8.** Turner explained that there was a specially designed handle which was usually used to control the rate of descent. However, he had misplaced this handle about a week before Pam's funeral.

**9.** Turner testified that he "would have followed [the funeral director's] directions" with regard to the lowering of the casket if she had

told him not to use the vice grips or not to lower the casket at the conclusion of the graveside service. However, Appellants do not seek to hold Connally/Compton liable for Turner's acts or omissions under a borrowed employee theory, nor did they seek a jury instruction on this theory. See St. Joseph Hosp. v. Wolff, 94 S.W.3d 513, 537–38 (Tex. 2003); see also Bell v. VPSI, Inc., 205 S.W.3d 706, 721 n. 3 (Tex.App.-Fort Worth 2006, no pet.) ("The nature of the control required either for joint enterprise liability or sovereign immunity is entirely different from the control necessary to impose vicarious liability for negligence of an independent contractor."). "When we measure the sufficiency of the evidence, we do so under the law as submitted in the charge if the complaining party did not object to the charge." Beaumont v. Basham, 205 S.W.3d 608, 619 (Tex. App.-Waco 2006, pet. denied) (citing Osterberg v. Peca, 12 S.W.3d 31, 55 (Tex.2000)) (other citations omitted).

would not have occurred."). Nor is there any evidence in the record to suggest that the Connally/Compton funeral director knew or should have known that the use of the vice grips would lead to an increased risk that the lowering device would fail.[10]

Accordingly, we cannot say that the jury's refusal to find Connally/Compton negligent "is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust." *See Dow Chem. Co.*, 46 S.W.3d at 242.

For the foregoing reasons, we sustain Appellants' first issue in part and overrule it in part.

### Texas Occupations Code Section 651.408

Appellants contend in their second issue that the court abused its discretion by refusing to instruct the jury in the charge that the funeral home was liable for the acts and omissions of the vault company under section 651.408 of the Occupations Code.

■ We review a trial court's rulings with regard to questions, instructions, and definitions to be included in a jury charge under an abuse-of-discretion standard. *See Roberson v. City of Austin*, 157 S.W.3d 130, 138 (Tex.App.-Austin 2005, pet. denied); *Baribeau v. Gustafson*, 107 S.W.3d 52, 60 (Tex.App.-San Antonio 2003, pet. denied).

Chapter 651 of the Occupations Code establishes the Texas Funeral Service Commission and governs "Cemetery and Crematory Services, Funeral Directing, and Embalming." *See* TEX. OCC.CODE ANN. ch. 651 (Vernon 2004 & Supp.2006). Section 651.408 provides:

> The fact that a funeral director contracts for cemetery or crematory ser-

vices, including [sic] as part of a package arrangement, does not limit the director's liability to the customer for those services.

*Id.* § 651.408 (Vernon 2004). Connally/Compton argues that this statute does not apply because the goods and services provided by Wilbert Vault are not "cemetery or crematory services." We agree.

Chapter 651 essentially divides the type of services to be provided in connection with the disposition of human remains into "funeral services," "cemetery services," or "crematory services." *See, e.g., id.* § 651.001(10) (Vernon 2004) (defining "funeral service"), § 651.004 (Vernon 2004) (entitled "Regulation of Cemetery and Crematory Services"), §§ 651.404, 651.405, 651.406 (Vernon 2004) (governing "consumer brochure," "retail price list," and "purchase agreement" for provision of funeral services), §§ 651.4055, 651.4065 (Vernon 2004) (governing "retail price list" and "purchase agreement" for provision of cemetery or crematory services); *see also* TEX. HEALTH & SAFETY CODE ANN. chs. 711–715 (Vernon 2003 & Supp.2006) (governing cemeteries), ch. 716 (Vernon Supp.2006) (governing crematories).

The term "funeral service" "means a service performed incident to a funeral ceremony or for the care and preparation of a dead human body for burial, cremation, or other disposition. The term includes embalming." TEX. OCC.CODE ANN. § 651.001(10). The Texas Funeral Service Commission has established the following pertinent regulatory definitions with respect to the term "funeral ceremony":

> Funeral ceremony—A service commemorating the deceased with the body present.

---

**10.** In fact, the only evidence in the record on this issue (James Turner's testimony) is that the use of the vice grips had nothing to do with the failure of the lowering device.

Graveside service—A funeral ceremony with the body present held at the burial site.

22 TEX. ADMIN. CODE § 203.1(8), (11). The various "funeral services" which must be disclosed in an itemized "retail price list" include:

(1) transferring a deceased person to the funeral establishment;

(2) embalming;

(3) using a funeral establishment facility for viewing the deceased;

(4) using a funeral establishment facility for funeral services;

(5) using a hearse;

(6) using a limousine;

(7) caskets;

(8) outer enclosures; and

(9) other itemized services provided by the funeral establishment staff.

TEX. OCC.CODE ANN. § 651.405(a).

■ By statute, the sale of the Wilbert Venetian Vault (*i.e.*, an "outer enclosure") constitutes the sale of a "funeral service." And as we have already observed, the purchase of this particular vault included purchase of the Wilbert Way service. Therefore, we hold as a matter of law that the goods and services provided by Wilbert Vault constitute "funeral services" and not "cemetery or crematory services." Accordingly, section 651.408 does not apply, and the court did not abuse its discretion by refusing to submit the requested instruction. Appellants' second issue is overruled.

**Spoliation Instruction**

Appellants contend in their third issue that the court abused its discretion by refusing to submit a spoliation instruction in the charge with regard to Wilbert Vault's discarding of the lowering device. Wilbert Vault argues primarily[11] that no spoliation instruction was warranted because such an instruction is available only as a sanction for discovery abuse and "no discovery was ever conducted with respect to the lowering device."

The Supreme Court has observed that a spoliation instruction is part of a trial court's exercise of "discretion to fashion an appropriate remedy to restore the parties to a rough approximation of their positions" in cases involving the loss or destruction of relevant evidence. *See Wal–Mart Stores, Inc. v. Johnson*, 106 S.W.3d 718, 721 (Tex.2003). The Court recognized that "[e]vidence may be unavailable for discovery and *trial* for a variety of reasons." *Id.* (emphasis added).

■ The Court further observed that Texas courts "have generally limited the use of the spoliation instruction to two circumstances: [1] the deliberate destruction of relevant evidence and [2] the failure of a party to produce relevant evidence or to explain its non-production." *Id.* The second instance usually involves discovery abuse, but the first does not. Accordingly, we hold that a spoliation instruction may be warranted in a case involving the loss or destruction of evidence even when there

**11.** Wilbert Vault also argues that any error in the failure to submit a spoliation instruction is harmless because the jury found Wilbert Vault negligent even without such an instruction. If we were affirming the judgment, we would agree. "Because we are already reversing the judgment and remanding this cause, and because the record on this issue is not fully developed, we will not rule on it.

But we will discuss the spoliation instruction to guide the trial court and the parties on remand." *Roberts v. Whitfill*, 191 S.W.3d 348, 360 (Tex.App.-Waco 2006, no pet.); *see also Edinburg Hosp. Auth. v. Trevino*, 941 S.W.2d 76, 81 (Tex.1997); *Nu–Way Energy Corp. v. Delp*, 205 S.W.3d 667, 684 (Tex.App.-Waco 2006, pet. denied).

is no allegation of discovery abuse.[12] *See Tex. Elec. Co-op. v. Dillard,* 171 S.W.3d 201, 208–09 (Tex.App.-Tyler 2005, no pet.) (upholding spoliation instruction in case not involving discovery dispute).

■ A spoliation instruction is warranted when the party had a duty to preserve the lost or destroyed evidence at issue. *Wal–Mart Stores, Inc.,* 106 S.W.3d at 722. "Such a duty arises only when a party knows or reasonably should know that there is a substantial chance that a claim will be filed and that evidence in its possession or control will be material and relevant to that claim." *Id.* Stated another way, such a duty arises when a party is "on notice that there [is] a substantial chance that the [the other party] would pursue a claim." *Id.*

Here, it is unclear from the record when Wilbert Vault was put on notice that there was a substantial chance the plaintiffs would pursue this claim. This issue will have to be determined before the trial court can decide whether to include a spoliation instruction in the charge. Based on the limited record before us, it appears that Gilmore would be entitled to a spoliation instruction if she lays the proper predicate. *See Roberts v. Whitfill,* 191 S.W.3d 348, 362 (Tex.App.-Waco 2006, no pet.).

## Conclusion

We affirm those parts of the judgment decreeing that the Pickens children take nothing on their claims and that Gilmore take nothing on her claim for future mental anguish. We reverse the judgment on the remainder of Gilmore's claims and remand this cause to the trial court for further proceedings consistent with this opinion.

Chief Justice GRAY concurring and dissenting.

TOM GRAY, Chief Justice, concurring and dissenting.

This is clearly one of those cases where it would be easier to check off as agreeing and hope that the consequences of the majority opinion will not be as great as I fear. I could conceivably rest my hope on the fact that this is a case involving a funeral service and may be largely ignored in any other context. But as "hope, while important, is not a strategy" (attributed to Gen. Tommy Franks, retired, United States Army; former Commander In Chief, United States Central Command), neither is hope a reason to allow bad precedent to be made without objection or dissent.

There are so many individual statements and holdings in the opinion with which I disagree that in the time I have available I could not address them all. But my problem in this regard is somewhat simplified because of the jury's answers and the overriding issue of whether the plaintiffs proved they were entitled to mental anguish damages. If the plaintiffs failed to prove mental anguish damages, all the remainder is meaningless dicta and should not be discussed at all. So I will discuss only why the majority opinion is wrong on

---

12. In the context of physical evidence, a party can be required to produce only those "documents or tangible things within the person's possession, custody or control." Tex.R. Civ. P. 196.3(a). If a particular item has been lost or destroyed before a request for production is served, it is no longer in the party's possession and its non-production necessarily cannot constitute a discovery violation. *See In re Kuntz,* 124 S.W.3d 179, 183–84 (Tex.2003) (orig. proceeding). Thus, were we to endorse Wilbert Vault's contention that a spoliation instruction is available only in cases involving discovery abuse, there would exist a perverse inducement to destroy potentially relevant evidence at the earliest opportunity. This would clearly undercut the very justifications for a spoliation instruction.

the issue of mental anguish and only when the other holdings become relevant in some future case will I then address the errors in those holdings.

### MENTAL ANGUISH DAMAGES

What happened at the graveside ceremony of Pam Pickens is not something that anyone would want repeated. The legal problem, as I see it and as argued to the jury, was how much, if any, of the mental anguish described in the testimony was proven by a preponderance of the evidence to have been caused by the failure of the casket lowering device rather than the natural and normal mental anguish caused to a mother by the sudden and unexpected death of a daughter with three young children of her own.

The jury, twelve good men and women of McLennan County duly selected and empanelled, were assigned the responsibility to decide, and in effect separate, the mental anguish proven as a result of the casket lowering device failure and that attributable to Pam's death. We do not know what part of the verdict two of the jurors did not agree with, but at least ten jurors agreed that the plaintiffs had not proven by a preponderance of the evidence that any legally compensable mental anguish, as defined in the charge, had been suffered by any of the plaintiffs.

Upon a proper motion, the duly elected trial court judge, after himself having sat through the trial, hearing all of the evidence, observing all of the testimony of all of the witnesses, and after careful review and due deliberation of the motion, refused to order a new trial on this theory. I agree with the ten jurors and the trial court.

While the majority opinion drops a footnote that the defendants must take the plaintiffs as they find them, 234 S.W.3d 251, 258 fn. 5, I believe they have inverted, possibly inadvertently, the impact of this relatively simple concept. While the plaintiffs' sensibilities may be heightened due to the circumstances in which the regrettable event occurred, the defendants are not legally responsible for the mental anguish which was caused by the unexpected and untimely death of Pam. It was the plaintiffs' burden to prove to the jury by a preponderance of the evidence the mental anguish, if any, proximately caused by the failure of the casket lowering device. The plaintiffs failed to prove such mental anguish to the jury's satisfaction.

To charge the defendants with all the mental anguish in reliance on the concept that you take the plaintiffs as you find them is error. Under their theory, a plaintiff who was already suffering from one ailment before an event could recover from a defendant responsible for the event, damages that were being suffered separate and apart from an incident that merely increased those damages. This is not the law.

If a person with only one leg has suffered loss of earning capacity, a defendant liable for the loss of the other leg does not pay for the loss of earning capacity for both legs, only the increased loss of earning capacity caused by the loss of the second leg. And a person who already has a disfigurement from a facial scar is not compensated for that original disfigurement if other or additional disfigurement is caused to that person.

The rule that you take a plaintiff as you find him is properly applied when the plaintiff's previously existing condition causes the additional injury to be more than it would have been if the plaintiff did not already have the preexisting condition. For example, if an elderly person is negligently knocked to the ground and due to brittle bones caused by osteoporosis

breaks a hip bone, the negligent person is liable for the broken hip bone even if the bone of a normal healthy person would not have broken in such a fall, but is not liable for the osteoporosis. *See Driess v. Friederick,* 73 Tex. 460, 11 S.W. 493 (1889). The plaintiff still must prove to the satisfaction of the jury that the bone broke as a result of the fall which was caused by the negligence of the defendant.

### CONCLUSION

It seems pretty clear that the jury was not convinced that the mental anguish, if any, being suffered by the plaintiffs was attributable to the event at the funeral rather than Pam's death so they answered "none" to the mental anguish damages question as to each plaintiff. Accordingly, because the trial court did not err in refusing to grant a new trial for factually insufficient evidence on the issue of mental anguish, I would overrule this issue. And, therefore, because the plaintiffs' have not proven any compensable damages, there would be no need to address any of the other issues raised by any of the parties in this appeal. Accordingly, I would affirm the judgment of the trial court in its entirety. Because the majority reverses the trial court in part, I dissent. To the extent the trial court's judgment is affirmed, I concur.[1]

---

1. As previously indicated, there are many other statements in the remainder of the majority opinion that are wrong but would be unnecessary for me to review due to the disposition of this single issue. Accordingly, I will not exhaust further resources addressing those errant holdings.