

# NUMBER 13-12-00169-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

**GRAHAM CENTRAL STATION, INC.,**                **Appellant,**

**v.**

**JESUS PENA,**                                     **Appellee.**

## On appeal from the County Court at Law No. 7 of Hidalgo County, Texas.

## MEMORANDUM OPINION

### Before Chief Justice Valdez and Justices Benavides and Longoria Memorandum Opinion by Chief Justice Valdez

By five issues, appellant, Graham Central Station, Inc., appeals from a final judgment entered in favor of appellee, Jesus Pena. In its first four issues, appellant contends that the evidence is legally and factually insufficient to support a finding that (1) appellant owned and operated or controlled the Graham Central Station nightclub in Pharr, Texas, (2) the amount awarded to Pena for medical expenses was reasonable

and necessary, (3) Pena suffered from mental anguish, (4) Pena was entitled to any damages for mental anguish, and (5) Pena was entitled to any damages for his pain and suffering. By its fifth issue, appellant contends that the trial court erred in allegedly "awarding damages in excess of Pena's pleaded-for amount." We modify the judgment and affirm in part as modified, and we reverse and render in part.

## I. BACKGROUND

This personal injury suit arises from a physical altercation that occurred between several patrons while on the premises of the Graham Central Station nightclub in Pharr, Texas. Appellee was injured and subsequently filed suit against Graham Central Station, Inc. A bench trial was held, after which the court entered a final judgment in favor of appellee in the amount of $450,000, together with pre-judgment interest in the amount of $153,000. This appeal ensued.

## II. LEGAL AND FACTUAL SUFFICIENCY

### A. Standard of Review

The test for legal sufficiency is "whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). We review the evidence in the light most favorable to the verdict, crediting any favorable evidence if a reasonable fact-finder could and disregarding any contrary evidence unless a reasonable fact-finder could not. *Id.* at 821–22, 827.

A no-evidence point will be sustained when (1) there is a complete absence of evidence of a vital fact, (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to

2

prove a vital fact is no more than a mere scintilla, or (4) the evidence conclusively establishes the opposite of a vital fact. *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003); *see City of Keller*, 168 S.W.3d at 810. Less than a scintilla of evidence exists when the evidence is "so weak as to do no more than create a mere surmise or suspicion" of a fact, and the legal effect is that there is no evidence. *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983).

When considering a factual sufficiency challenge to a jury's verdict, courts of appeals must consider and weigh all of the evidence, not just that evidence which supports the verdict. *Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406–07 (Tex. 1998). A court of appeals can set aside the verdict only if it is so contrary to the overwhelming weight of the evidence that the verdict is clearly wrong and unjust. *Id.* at 407.

## B. Ownership and Control of Graham Central Station

In its first issue, appellant complains that the evidence is insufficient to prove that it owned the nightclub.

### 1. Applicable Law

As a rule, "a person has no legal duty to protect another from the criminal acts of a third person." *Timberwalk Apts. v. Cain*, 972 S.W.2d 749, 756 (Tex. 1998). An exception is that "one who controls . . . premises does have a duty to use ordinary care to protect invitees from criminal acts of third parties if he knows or has reason to know of an unreasonable and foreseeable risk of harm to the invitee." *Id.* The exception applies, of course, to a landlord who "retains control over the security and safety of the

3

premises." *Id.* The duty may be imposed on a person "who owns or controls [the] premises." *Id.*

## 2. Discussion

Through deposition testimony, Roger Gearhart testified as corporate representative for "Pharr Entertainment Complex, L.L.C." ("PEC"). Appellant's trial counsel read the deposition testimony of Gearhart, in relevant part, as follows:

Q.    Mr. Gearhart, what is your position with Graham Central Station?

A.    I'm a minority owner.

Q.    Minority owner, okay. And the full name for that company is different than Graham Central Station; is that correct?

A.    That's correct.

Q.    And what is the real name for that, for Graham Central Station?

A.    Pharr Entertainment Complex, L.L.C. ["PEC"]

Q.    Okay. And who besides yourself is an owner of that corporation?

A.    I'm not sure who the exact owners are.

Q.    Okay. And are you a minority owner.

A.    That's correct.

Q.    And what is your percentage of the ownership of this corporation?

A.    Ten percent.

Q.    Ten percent? Okay. And are you here as the corporate representative for the corporation?

A.    I am.

When asked "when something happens at the station, reports are to be provided by the manager, to yourself . . . is that correct," Gearhart replied, "That's correct." Gearhart

4

also indicated that "he" provides security at the nightclub and that the security is "in-house-security that works for the club."

The trial court admitted into evidence, defendant's exhibit 2, which includes appellant's answers to interrogatories posed by Pena. This exhibit shows that Pena asked for the identity of the person answering the interrogatories. Gearhart stated that he was the person answering the interrogatories on behalf of appellant. The first interrogatory asked Gearhart to identify his correct title and position within the organizational structure if he was "answering [the] interrogatories as the authorized representative of Graham Central Station[, Inc.]."[1] Gearhart identified himself as the president of Graham Central Station[, Inc.].[2] Gearhart identified "El Centro Mall, LTD" as the owner of the premises where the nightclub was located. He then identified PEC as the tenant in possession of the property where the nightclub was located.

Mark Threadgill is an attorney who previously represented appellant and who testified as its corporate representative at the trial. According to Threadgill, appellant, "Graham Central Station, Inc.," has no ownership interest in, relationship with, or business connection to PEC. Threadgill also testified that appellant, "Graham Central Station, Inc.," has no role in the management of PEC and no role in providing security for the nightclub.

Pena's attorney asked Threadgill "What does the initials 'L.L.C.,' stand for, and Threadgill responded, "Limited Liability Company." When asked about the initials,

---

[1] The question did not clarify whether it was "Graham Central Station, Inc." However, upon our review of the record, the only party to whom the interrogatories may have referenced is appellant.

[2] Gearhart's answers to the interrogatories were filed in the trial court in appellant's response to Pena's first set of interrogatories. This document states, "NOW COMES Graham Central State, Inc., Defendant, and responds to this Set of Interrogatories propounded by Jesus Pena pursuant to Rule 197 of the Texas Rules of Civil Procedure."

5

"INC," Threadgill replied, "If you're talking about for a corporation, it means incorporated." Threadgill agreed that a corporation was "different than a company."

Javier Gallegos, a former police officer, testified that he was a security guard at the nightclub when Pena claimed he was attacked and injured. He testified that he was paid by "Graham Central Station" to provide security at the nightclub. He did not specifically testify that he was paid by "Graham Central Station, Inc." Nor did he testify that he was paid by PEC doing business as Graham Central Station.

Viewing the evidence in the light most favorable to the trial court's verdict, we conclude that: (1) Gearhart owned a ten percent interest in "the corporation" Graham Central Station; (2) Gearhart did not know who else had an interest in that corporation; (3) "Graham Central Station" was also known as PEC; (4) PEC is not a corporation but is a limited liability company; (5) the only corporation to which Gearhart could have been referencing is one named "Graham Central Station"; (6) appellant is known as "Graham Central Station, Inc."; (7) "INC" refers to a corporation; (8) Gearhart served as the president of "Graham Central Station, Inc."; (9) Gearhart answered Pena's interrogatories as the corporate representative of "Graham Central Station, Inc."; (10) Gearhart appeared at his deposition as the corporate representative of a corporation; and (11) Gallegos stated that he received his paycheck from "Graham Central Station." Although Gallegos did not specifically say that it was "Graham Central Station, Inc." that paid him, the trial court as the finder of fact was free to make any inference that logically flowed from the evidence as set out above including that Gearhart owned an interest in "Graham Central Station, Inc.," which was responsible for providing security guards to the nightclub. Regarding Threadgill's testimony that appellant was in no way associated

6

with the nightclub or PEC, the trial court, as the finder of fact, was free to disbelieve Threadgill's testimony. *See City of Keller*, 168 S.W.3d at 811 ("Evidence can be disregarded whenever reasonable jurors could do so an inquiry that is necessarily fact-specific."). We conclude that there was some evidence from which the trial court could have inferred that appellant (Graham Central Station, Inc.) owned the nightclub and thus controlled the premises.

Therefore, viewing the evidence under the proper standards, we conclude that the evidence was legally and factually sufficient to support the trial court's finding that appellant owned the nightclub.

## III. DAMAGES

By its second, third, and fourth issues, appellant contends that the evidence is legally and factually insufficient to support the amount of damages awarded. Specifically, by its second issue, appellant argues that the medical expenses were not proven by expert testimony and the evidence was not competent to show that the treatment Pena received was proximately caused by this incident. By its third issue, appellant specifically argues that Pena's "testimony establishes nothing more than 'mere emotions,' which are insufficient to support an award of mental anguish." Finally, by its fourth issue, appellant argues specifically that Pena did not adequately explain the physical pain he felt and the amount the trial court awarded was excessive for the actual pain and suffering Pena experienced.

## A. The Evidence

Pena testified that an altercation ensued while he was in the nightclub, and a group of men beat his companion. Pena attempted to intervene. Someone threw a

7

bottle that hit Pena on the head and cut him on the forehead. Pena "stumbled back" and he felt the men "trying" to hit him as he attempted to retreat. "Eventually," Pena tripped and fell. Pena testified that then a security guard working at the nightclub tackled Pena and held him as a group of possibly five or six men repeatedly hit Pena in the face. The security guard then escorted Pena out of the nightclub. Some of the men who had assaulted Pena were also escorted out of the nightclub by security guards.

As the attackers were escorted out, Pena witnessed one of the attackers pointing and laughing at him and his companion who had also been injured. Pena pointed out the individuals who had attacked him and his companion to the security guards. Pena found it "weird" that the security personnel would allow the attackers to remain in an area that was located in close proximity to his location. Pena "assumed" that because the attackers had not left the premises and were pointing and laughing at him and his companions, the attackers were waiting to attack him again. Pena told a security guard, "Look, we don't want to go." Pena informed the guards that his reason for not wanting to leave was that he had been assaulted by a group of men who were standing close by. Pena was ordered to leave or be arrested.

Because Pena and his companions "had no choice," they walked to the vehicle in the parking lot. One of the attackers began walking toward Pena, so he attempted to "speed walk." One of the attackers then lunged at Pena and Pena defended himself from the attack. Several men then took turns punching Pena in the face as Pena attempted to retreat to his vehicle. The attackers assaulted Pena's companions at the same time as they attempted to retreat to the vehicle.

Pena described the injuries he received as follow:

8

Inside was the—I got hit on the head with a bottle and I also got hit in the back, which I have scars for it. And while I was on the floor, I got hit on the side of my ribs and then as I was trying to cover myself, like on the back part of the arms and my legs. And then once I got held, he hit me in the face, so I had like, you know, swelling on my face.

. . . .

Outside the club it was mainly my face because he wouldn't let go of my shirt. Somehow he got his hand inside my shirt and he had it held from inside. So even if I was trying to move, I couldn't, and he was so close that he just kept hitting me in the face, hitting me in the face. So, it was basically like—

None of the security guards intervened in the altercation that took place in the parking lot.

Pena went to a doctor in Mexico to treat his injuries. The doctor's bill was for $1,000. Pena did not have medical insurance. The doctor "kept [Pena] overnight because he thought that was the best thing to do because of the pain and injuries" that Pena had suffered.

During the attack, Pena felt "scared" and "feared for [his] friends' safety, originally." "Afterwards, [Pena] feared for [his own] safety." Pena stated, "I mean the physical pain was obvious. I was bleeding from my forehead, from the back of my head. I had bruises all over my ribs, my arms." Pena was "mainly afraid" when he was outside the nightclub. Pena stated he was afraid "knowing that the individuals [who assaulted him were] laughing at [them], looking at [them], pointing at [them], and [he] knew that as soon as [he] stepped out of that comfort zone, [he] knew what was going to happen. [He] knew that they were just waiting for [them] to walk away from [the nightclub]." Pena agreed that he had physical pain at the time of the assault and for "[a] month or two months" after. Pena said, "Once again, my ribs were swollen pretty good.

9

I had cuts on my head, took a long while to heal.  I was like dizzy for weeks.  I couldn't sleep."

Pena agreed that after the assault he suffered from mental anguish and depression.  Pena explained:

> I mean, I still don't go to clubs.  You know, like it's it's—I mean, it affected everything, you know.  First, of all, I stay away from clubs period, whether they say you're going to be protected or not, for fear of something like that happening, I'm trying to avoid it.  It influenced my relationship with my girlfriend at the time.  I couldn't sleep at night.

> Now, if I see an officer, it's not the same to say they are here to protect and serve us.  It's more like, you know, who do I go to.  I mean, I thought that was the only thing I had.

> . . . .

> Well, since I was depressed, I mean, you know, our relationship [with my wife] just kind of went downhill at that moment.

> . . . .

> I didn't, I couldn't sleep and the little time that I did sleep, I mean, it was, you know, like all kinds of nightmares.  Because of the result of not sleeping, sometimes I couldn't perform as I should at work.  Basically, everything, I mean, up to now, I'm like panicking to be here.

On cross-examination, Pena clarified that he still has insomnia due to the assault at the nightclub.  Pena stated that he "wished" that his life "would go back to normal" and that "everything was different."  Pena explained that his life is not normal because his "trust in security and clubs and officers is gone" and he is not "the same person" he used to be.  Pena reiterated that he "wished" that his life "could actually be normal."  Pena said, "These days that I feel depressed or, you know, I haven't slept right or, you know, I'm a little bit distant with [my wife] or whatever."

10

## B. Medical Expenses

A claim for past medical expenses must be supported by evidence that such expenses were reasonable and necessary and related to the accident made the basis of the lawsuit. *Torrez v. Sanders*, 163 S.W.3d 133, 134 n.1 (Tex. App.—San Antonio 2005, no pet.); *Rodriguez-Narrea v. Ridinger*, 19 S.W.3d 531, 532–33 (Tex. App.—Fort Worth 2000, no pet.); *see also Haddard v. Rios*, No. 13-07-00648-CV, 2012 Tex. App. LEXIS 2706, at *8–9 (Tex. App.—Corpus Christi, Apr. 5, 2012, pet. denied). There are two ways in which a plaintiff can prove necessity of past medical expenses: (1) presenting expert testimony on the issues of reasonableness and necessity; or (2) presenting an affidavit prepared and filed in compliance with section 18.001 of the Texas Civil Practice and Remedies Code. *Walker v. Ricks*, 101 S.W.3d 740, 746–47 (Tex. App.—Corpus Christi 2003, no pet.); *Rodriguez-Narrea v. Ridinger*, 19 S.W.3d 531, 532-33 (Tex. App.—Fort Worth 2000, no pet.).

Here, Pena neither presented expert testimony that his past medical expenses were reasonable and necessary nor presented an affidavit prepared and filed in compliance with section 18.002 of the Texas Civil Practice and Remedies Code. Therefore, we conclude that the evidence is insufficient to support an award of past medical expenses. We sustain appellant's second issue.

## C. Mental Anguish and Pain and Suffering

The term mental anguish implies a relatively high degree of mental pain and distress. *Wal-Mart Stores, Inc. v. Odem*, 929 S.W.2d 513, 528 (Tex. App.—San Antonio 1996, writ denied). Mental anguish encompasses more than mere disappointment, anger, worry, anxiety, resentment or embarrassment, although it may

11

include all of these. *Id.* Mental anguish "includes a mental sensation of pain resulting from such painful emotions as grief, severe disappointment, indignation, wounded pride, shame, despair or public humiliation or a combination of any of these." *Id.*; *see also Serv. Corp. Int'l v. Guerra*, 348 S.W.3d 221, 233 (Tex. 2011).

Mental anguish damages will pass a legal sufficiency review if evidence is presented describing the nature, duration, and severity of the mental anguish suffered. *Fifth Club, Inc. v. Ramirez*, 196 S.W.3d 788, 797 (Tex. 2006). Such evidence, if presented, establishes a substantial disruption in a daily routine. *Id.* Mental anguish damages will also pass legal sufficiency review if evidence is presented of "a high degree of mental pain and distress that is more than mere worry, anxiety, vexation, embarrassment, or anger." *Gilmore v. SCI Texas Funeral Servs., Inc.*, 234 S.W.3d 251, 256 (Tex. App.—Waco 2007, pet. denied) (internal quotations and citations omitted).

> It is within the jury's province to judge the credibility of witnesses and the weight to be given their testimony. This is especially true regarding claims for mental anguish, which are necessarily speculative claims, and, thus, should be left to a jury for determination.
>
> Much discretion must be given to the jury in setting the amount because they are best suited to determine whether and to what extent the defendants' conduct caused compensable mental anguish.
>
> Once the existence of mental anguish is established, the incalculable amount cannot logically be refuted or shown to be factually insufficient because there are no objective facts by which to measure the amount. Appellate courts are not free to substitute their judgment for that of a jury.

*Wal-Mart Stores, Inc.*, 929 S.W.2d at 528 (internal citations omitted); *see also Clayton v. Wisener*, 190 S.W.3d 685, 697 (Tex. App.—Tyler 2005, pet. denied) (citing *White v. Sullins*, 917 S.W.2d 158, 161 (Tex. App.—Beaumont 1996, writ denied) (establishing that damages, such as future physical pain, mental anguish, physical impairment, and

12

disfigurement are necessarily speculative and particularly within the fact-finder's province to resolve)); *Weidner v. Sanchez*, 14 S.W.3d 353, 367 (Tex. App.—Houston [14th Dist.] 2000, no pet.) ("Because an exact evaluation of mental anguish is impossible, juries must be given discretion in finding mental anguish damages that would fairly and reasonably compensate the plaintiff for her loss."). There must also be evidence that the amount of mental anguish damages awarded is fair and reasonable, and the appellate court must perform a "meaningful evidentiary review" of the amount found. *Saenz v. Fidelity & Guar. Ins. Underwriters*, 925 S.W.2d 607, 614 (Tex. 1996).

In *Saenz*, which appellant cites in support of its argument, the Texas Supreme Court held that the plaintiff's testimony—"I worried about that a lot"—was an insufficient basis for awarding mental anguish damages because it did not establish a "substantial disruption in daily routine" or "a high degree of mental pain and distress." *Id.*

In this case, in contrast, there was direct evidence of the nature, duration, and severity of Pena's mental anguish, establishing that there was a substantial disruption in his daily routine. Pena testified that the incident has manifested in the physical condition of depression and insomnia and that his daily routine has been disrupted due to his inability to sleep. Pena stated that the inability to sleep and the depression was ongoing since the date of the attack. Pena testified that at the time of the attack he suffered a head injury when a bottle was thrown at him. Pena stated that he felt pain due to the injuries he received, that the pain was obvious considering the types of injuries he sustained, and the doctor kept him overnight due in part to the pain.

Appellant argues that testimony similar to Pena's has been found to be insufficient. However, "Texas authorizes mental anguish damages as an element of

13

recoverable damages in virtually all personal injury actions where the defendant's conduct causes serious bodily injury. Where serious bodily injury is inflicted, . . . we know that some degree of physical and mental suffering is the necessary result." *Weidner*, 14 S.W.3d at 367 (internal citations and quotations omitted); *see Wal-Mart Stores, Inc.*, 929 S.W.2d at 528 ("In cases involving assault and battery [statutory assault], a plaintiff may recover for mental suffering apart from other injuries."); *see also Serv. Corp. Int'l*, 348 S.W.3d at 233 (finding that plaintiff's testimony that she suffered from insomnia, stomach ailments, headaches, depression and anxiety amounted to some evidence that she suffered compensable mental anguish). Here, Pena provided evidence that he was attacked by a group of men who assaulted him, and the trial court found that appellant had a duty to prevent that assault. In addition, the trial court may have reasonably concluded that Pena suffered serious bodily injury because the doctor ordered him to remain in the hospital overnight after a bottle was thrown and hit him on the head causing bleeding and dizziness, and the dizziness lasted for several weeks after the incident.

Therefore, applying the appropriate standards of review, we conclude that the evidence was legally and factually sufficient to establish that Pena suffered mental anguish and pain and suffering. Accordingly, we overrule appellant's third and fourth issues.

## IV. MODIFICATION OF THE JUDGMENT

By its fifth issue, appellant contends that the trial court impermissibly awarded damages in excess of the amount requested by Pena in his live pleading. Pena agrees

with appellant and also requests that we reform the judgment to reflect that he was only entitled to $250,000 as pled in his live pleading.

Accordingly, without addressing the merits of appellant's fifth issue, we modify the judgment to reflect that Pena was entitled to $249,000 in damages.[3]

## V. CONCLUSION

We modify the judgment to reflect that Pena is awarded $249,000 as damages for mental anguish and pain and suffering, and we affirm the judgment awarding damages for mental anguish and pain and suffering as modified. We reverse the judgment insofar as it awards $1,000 in damages for medical expenses and render a take nothing judgment in that regard.

_____
ROGELIO VALDEZ
Chief Justice

Delivered and filed the
9th day of May, 2013.

---

[3] We have subtracted $1,000 from the amount because we have sustained appellant's issue regarding the sufficiency of the evidence to support the amount of damages awarded to Pena for his medical expenses.